**Connie L. HASCHMANN,**
**Plaintiff–Appellee,**

v.

**TIME WARNER ENTERTAINMENT COMPANY, L.P., doing business as Cablevision New York, Defendant–Appellant.**

Nos. 97–3333, 97–3708.

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1998.

Decided July 29, 1998.

---

**4.** See p. 12 of opinion below.

George Burnett (argued), Liebmann, Conway, Olejniczak & Jerry, Green Bay, WI, for Haschmann.

Winston A. Ostrow (argued), Godgrey & Kahn, Green Bay, WI, for Time Warner Entertainment Co. in No. 97–3333.

William Duffin, Godfrey & Kahn, Milwaukee, WI, Winston A. Ostrow (argued), Godfrey & Kahn, Green Bay, WI, for Time Warner Entertainment Co. in No. 97–3708.

Before FLAUM, EASTERBROOK and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

Connie Haschmann was diagnosed to have systemic lupus erythematosus ("lupus") in 1988. After her employer, the Green Bay Division of Time Warner Entertainment Company, L.P. ("Time Warner"), terminated her employment in 1995, Ms. Haschmann filed a complaint against the company, alleging that it fired her in violation of the Americans with Disabilities Act ("ADA"), codified at 42 U.S.C. §§ 12101–213, and the Family and Medical Leave Act ("FMLA"), codified at 29 U.S.C. §§ 2601–54. A jury found for Ms. Haschmann and awarded her damages of $32,000 in back pay and $8,000 in compensatory damages; the district court later amended the judgment to include attorney's fees and costs.[1] After the district court denied the company's postjudgment motions, Time Warner appealed the jury verdict. For the reasons presented in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. Facts

As we review the record and set forth the factual background of this case, we keep in mind that we are reviewing a jury verdict and therefore "must take the evidence and all reasonable inferences in the victor's favor." *Transport Ins. Co. v. Post Express Co.*, 138 F.3d 1189, 1192–93 (7th Cir.1998). We first shall set forth the undisputed facts that form the basis of this action; we then shall describe the controverted matters at the heart of this controversy; lastly, we shall present other matters of record that must be considered in our review of the jury's verdict.

### 1.

Ms. Haschmann was employed for seven months as the Vice President of Finance of Time Warner's Green Bay Division, from April 3, 1995, to the date of her termination,

---

1. The original judgment, the jury verdict, awarded Ms. Haschmann back pay of $32,000 and compensatory damages of $8,000. *See* R.54. The district court's amended judgment added attorney's fees and costs in the amount of $33,404.13.

See R.66. The second amended judgment increased the amount to $34,855.37. *See* R.80. The defendant appealed from all three judgments.

November 3, 1995. She had been working in Time Warner's larger Rochester, New York, Division as a division controller since 1991. In fact, she had been awarded a Walter Kaitz Fellowship upon joining Time Warner and had received superior evaluations every year she was there. Her transfer to the Green Bay Division was a promotion; in Green Bay, as Vice President of Finance, she was the Chief Financial Officer of the Division. She headed a department of ten employees, three of whom reported directly to her. As Vice President of Finance, Ms. Haschmann was responsible for all the financial and accounting matters of the Division including budgeting, inventory, compliance with governmental regulations, customer relations and financial reporting. Her other duties included the hiring, training and supervision of employees. She was also responsible for the preservation of company assets through the implementation of and compliance with financial and fiscal controls, policies and procedures. She reported directly to Kathy Keating, the President of the Green Bay Division.

Ms. Haschmann suffers from systemic lupus erythematosus ("lupus"), an autoimmune system disorder that affects the central nervous system and is without cure.[2] The course of the disease is unpredictable; it has periods of inactivity and periods of flare. During a temporary flare, lupus causes joint pain, inflammations and extreme fatigue; it can affect a person's ability to process information. Ms. Haschmann's affliction with the disease was well known in the Rochester division, but it did not affect her job performance before her arrival at the Green Bay Division. In fact, she felt fine the first few months; however, in July and August, 1995, Ms. Haschmann began to notice difficulties in processing information and in communicating. Division president Keating criticized her for a lack of thoroughness; the criticism

continued and the relationship between Ms. Haschmann and Keating deteriorated.

On August 18, 1995, Time Warner consulted Dr. Richard Baumann, an industrial psychologist, about Ms. Haschmann's problems at work and her poor personal relationship with Keating. On August 23, 1995, Dr. Baumann met with Ms. Haschmann, Keating and Tom LaFleur, Time Warner's Personnel Director. LaFleur and Keating told him of Time Warner's dissatisfaction with Ms. Haschmann's performance, and Ms. Haschmann told him of her dormant lupus condition. Ms. Haschmann acknowledged that there were problems between herself and Keating which she attributed to different operating styles and poor communication. Dr. Baumann suggested that both Ms. Haschmann and Keating evaluate Ms. Haschmann's performance. Ms. Haschmann's self-evaluation acknowledged that she considered her performance unacceptable; in fact, she rated herself marginal or unsatisfactory in 10 out of 12 categories. Keating's evaluation was highly critical of Ms. Haschmann's performance. Keating testified that she then decided to let Ms. Haschmann go in September.

On August 28, 1995, Ms. Haschmann had her first appointment with a lupus specialist in the Green Bay–Appleton area; she saw rheumatologist Dr. Kent Partain. At that time, Dr. Partain testified, Ms. Haschmann's lupus showed no significant activity; however, around September 14th, she had a marked change of her symptoms. He noted her double vision, blurred vision, damage to the nerves in her brain and difficulties with her memory and her judgment. When Ms. Haschmann saw Dr. Partain again on September 21, 1995, her condition had worsened. The day before, her eye had swelled shut, her face had palsied, and her symptoms had mimicked a stroke. On September 21, Dr.

---

**2.** Systemic lupus erythematosus is defined thus: a chronic, remitting, relapsing, inflammatory, and often febrile multisystemic disorder of connective tissue, acute or insidious in onset, characterized principally by involvement of the skin, joints, kidneys, and serosal membranes. It is of unknown etiology, but it is thought to represent a failure of the regulatory mechanisms of the autoimmune system that sustain self-tolerance and prevent the body from attacking its own cells.... The disorder is marked by a wide variety of abnormalities, including arthritis and arthralgias, nephritis, central nervous system manifestations, pleurisy, pericarditis, leukopenia. ... *The Sloane–Dorland Annotated Medical–Legal Dictionary* 330 (1992 supp.).

Partain recommended that she take a medical leave of absence.[3]

Upon Dr. Partain's recommendation, Time Warner granted Ms. Haschmann medical leave beginning on September 21, 1995. Dr. Partain indicated that the leave would range from 2 to 4 weeks in length. As of October 9, 1995, he allowed her to return to work gradually, moving from four hours per day the first week to eight hours a day three weeks later. On her first day back, Ms. Haschmann met with LaFleur and Keating for over an hour to explain the disease and her doctor's instructions concerning the treatment of the lupus flare. On October 11, Ms. Haschmann and Keating met to discuss her employment evaluation. Both agreed that Ms. Haschmann's performance over the last few months before her illness had been poor. According to Ms. Haschmann, Keating promised to give her an opportunity to improve her performance once her health returned and she began working full time. Keating denied that she made this promise. Keating's only specific criticisms of Ms. Haschmann after that time were for attending a dinner on behalf of the company and for arriving at work too early one day.[4] Ms. Haschmann testified that she knew what Keating wanted her to work on and she was focusing on doing the best job she could.

On October 26, 1995, Ms. Haschmann had a relapse which required her to take a second leave of absence. Dr. Partain testified that he expected the leave to be short-lived. Ms. Haschmann called Time Warner and requested the leave. In response, LaFleur asked her to report to the main office on November 2, 1995, and to bring her keys.[5] On November 2, Ms. Haschmann obtained a note from Dr. Partain stating that she was advised to remain off work due to a flare of her central nervous system as a result of her lupus. Unable to come to work on November 2, she postponed the meeting. When Ms. Haschmann reported on November 3, she was fired. On the same day, Time Warner received a letter from Ms. Haschmann's attorney advising Time Warner that Ms. Haschmann would be absent from work for 2 to 4 weeks and explaining her rights under the ADA and the FMLA. When Ms. Haschmann asked for an explanation for her termination, especially in light of Keating's promise of further opportunity just a few weeks earlier, Ms. Haschmann's questions went unanswered. Ms. Haschmann testified that she was fired despite her attorney's notice to Time Warner that she was on leave under the FMLA.

**2.**

The dispute at trial centered on when Ms. Haschmann's performance of her duties became unacceptable. Keating testified that Ms. Haschmann's performance was unacceptable continuously from the day she began working in the Green Bay Division, April 3, 1995.

At trial, Keating detailed the problems with Ms. Haschmann: In April and May, Keating testified, Ms. Haschmann was unable to do a relatively simple analysis in connection with the company's budget review. According to Keating, Ms. Haschmann

3. Dr. Partain's records for September 21, 1995, reflect the following:

This 36–year old white female patient presents off schedule stating that for the past week she has had a number of different symptoms that have occurred, including difficulties with concentration, finding it difficult to understand particularly verbal messages and processing them. She has been more forgetful of more recent events. One week ago, she was told by her human resource director that she may have to look for a different job. She has been experiencing sparkling lights before the eyes, intermittent double and/or blurred vision. She has been unable to open her left eyelid for the past day or so. The left leg gave out perhaps secondary to weakness two days ago. Last night she found it difficult to stand secondary to lightheadedness and a feeling almost as if the room was spinning about her.... Ex.1.

4. Ms. Haschmann testified that Keating chastised her for attending a Chamber of Commerce dinner the evening of October 9, 1995, ostensibly because she had supposedly violated her doctor's orders. Ms. Haschmann testified that her doctor had given her permission to go.

5. It is not clear whether Time Warner actually denied or granted the leave. Ms. Haschmann spoke several times to LaFleur; he did not demand that she return to work until November 2, and so she assumed she was not absent without leave.

could not gather pricing and marketing information and "was never able to figure the composite rate and that is a basic element of the VP of finance." Tr. at 306. Ms. Haschmann also had difficulty coping with the company's inventory system, Keating testified. Keating claimed that she spent time in July and August with Ms. Haschmann explaining how to approach the division's budget process; even though Ms. Haschmann had told Keating that she had done budgeting before and that she knew the software, Ms. Haschmann could not get it right, Keating testified. In addition, Keating told the jury that, from April through July of 1995, several employees working under Ms. Haschmann expressed their frustration that her communications were unclear and that they would have to repeat a project because it was not what Keating had wanted. In Keating's opinion, this was causing a morale problem. Keating testified that Ms. Haschmann admitted that these problems existed and knew that Keating was dissatisfied with her performance by August of 1995.

Ms. Haschmann's perception of her job performance differed significantly from Keating's. In her view, her work was acceptable in the first months of her employment, and she was getting along well with others in the office. Nevertheless, "if I did something that was wrong [Keating] let me know." Tr. at 69. Ms. Haschmann testified that, in July and August, she began experiencing difficulties processing information and communicating, and in September the problems increased. She described her frustration; she "was known as the human filing cabinet in Rochester [because she] retained everything," tr. at 70, she testified, and now she was unable to remember things. In August and September, Keating began her "verbal counseling" concerning Ms. Haschmann's performance shortcomings; after Keating told Ms. Haschmann of her errors, Keating would keep a record of the talk. Keating testified that she had learned in August that Ms. Haschmann was suffering from lupus; however, she never attempted to learn about the disease or to discuss it with a physician or an expert who could evaluate whether Ms. Haschmann's problems were related to her lupus or to her abilities. Keating testified

that she had decided to fire Ms. Haschmann by October 10. Nevertheless, she did not fire her on that date because "[i]t was a difficult decision," one that she thought about "for a long time." Tr. at 291. Keating agreed that Ms. Haschmann's praise-filled employment evaluations from the Rochester Division were completely different from Keating's evaluations. Although she admitted that the differences confused her, she made no effort to determine whether the problems Ms. Haschmann was experiencing were due to her ability or the effects of the lupus. Keating testified that she fired Ms. Haschmann "for performance. That's the only judgment I made." Tr. at 296.

Keating testified that she had decided to fire Ms. Haschmann before October 10; nevertheless, on October 11, Keating met with Ms. Haschmann to review her performance evaluation. The overall evaluation was marked "unsatisfactory," but Keating recommended actions for improvement (such as meeting schedules and implementing quality control procedures) and suggested that she use the company's employee assistance program to improve her interpersonal skills. Ms. Haschmann testified that, when she asked Keating how much time she had to improve her performance, Keating told her that she would have that chance and that they would agree on a time frame after she returned to work full time. Keating, in her testimony, denied making any promise to give Ms. Haschmann adequate time to improve her performance and denied that her recommendations (that Ms. Haschmann use the employee assistance program, for example) were meant to suggest that she would have a continued opportunity to do her job.

### 3.

Ms. Haschmann entered into evidence at trial Time Warner's employment policy on medical leave, which provides:

> Disabled employees will be eligible for a medical leave of absence as long as they are receiving short-term disability, long-term disability, worker's compensation, state disability benefits or social security disability benefits.

Ex.17. The policy allows reinstatement to one's current job if an employee returns from a medical leave within 12 weeks; if the position is not open at that time, the company promised to place the employee in a similar position at the same rate of pay and benefits. An employee who returns to work from longer leave is reinstated to the same or similar position if it is open. Ms. Haschmann's job was open on January 1, 1996, the date Dr. Partain allowed her to return to work without restriction.

When, after her discharge, Ms. Haschmann asked a company representative about unemployment compensation, she was told that she was ineligible because she was unable to work. She was referred to the Social Security Administration and told to apply for Social Security disability benefits. In that application, she stated: "I became unable to work because of my disabling condition on September 21st, 1995." Tr. at 151; Ex.59. While in the process of applying for benefits, Ms. Haschmann was admitted to a hospital for pulse therapy and chemotherapy between November 10 and 12, 1995.[6] On November 17, 1995, she completed her application for Social Security disability benefits. On the form she described "why you feel your condition prevents you from performing all types of work":

> Due to extensive medication (including chemotherapy) and severe chronic fatigue requiring me to sleep various times during the day without advance warning. Severe joint pain does not allow exertion without aggravating condition.

Ex.68 at 1. In the vocational report, Ms. Haschmann described the high responsibilities of her position as Vice President of Finance and her present physical condition:

**6.** When Ms. Haschmann saw Dr. Partain on November 6, 1995, he recorded her condition in this way:
> She has a return of the right arm numbness and weakness and weakness intermittent facial numbness about the right. The patient has had difficulties with mentation, about the same as when seen by Dr. Neunaber, at which time she was tested as being in the 15th percentile in the population.

Ex.1.

**7.** Dr. Partain's records from November 22, 1995, state:

In my current status (physical) it would be impossible to carry out any of my previous functions or responsibilities or even simple tasks such as filing due to the extensive chronic fatigue I experience daily. During the day I become very tired, get a severe headache, lay down to sleep for hours at a time. It is not uncommon for me to take 2–3 naps/day. The time of the day varies, some days it is early in the morning, some days twice in the afternoon. I struggle with this daily because it is difficult to plan anything. The attacks are severe and sudden. On many occasions, I have had to stop what I'm doing and lay down on the floor. The attacks have also required someone else to drive me home because I become so sleepy and unsafe to drive.

Ex.60 at 6. She filed her disability claim based on her condition in November 1995.

Following her brief hospitalization during November 10–12, Ms. Haschmann saw Dr. Partain on November 22, 1995. At that time, his records indicated her marked improvement.[7] When Ms. Haschmann saw Dr. Partain again on December 27, 1995, she told him that she felt "pretty much back to normal." Ex.1. Dr. Partain released her to return to work at that point. However, her condition worsened again, and when she saw Dr. Partain on February 7, 1996, his notes indicated such symptoms as weakness in her limbs (which led to frequent slipping and falling), numbness on the left side of her face, fatigue, lightheadedness, rash and thinning of her hair.

On February 12, 1996, when Ms. Haschmann saw Dr. Michael Rieder, a neurologist, at the request of the Social Security Administration, her condition was in serious flare.[8]

> This patient returns stating that she has been doing quite well since our last evaluation. She feels that her concentration, memory and thinking processes have pretty much normalized. The sparkling lights and other fortification disappeared. The parethesias, facial droop and numbness have disappeared as well. Her major trouble has been of fatigue, such that she sleeps up to 3 hours daily.

Ex.1.

**8.** Dr. Rieder recorded her medical history as follows:

In Dr. Rieder's opinion, Ms. Haschmann could not perform her duties as Vice President of Finance when he saw her on February 12, 1996. Ms. Haschmann also admitted that she could not have handled Time Warner's finances at that time. Dr. Partain's response, when asked what he would have told Time Warner if it had asked him whether he expected that Ms. Haschmann could return to her work as a Vice President of Finance, was this comment:

> I would merely reiterate what I said in the letter dated 9–25–95 and that is it is my hope that the patient's symptoms will markedly improve with adequate therapy and that I was optimistic that her period of disability would be short lived.

Tr. at 195–96.

Time Warner called as a witness Dr. Daniel McCarty, a medical school professor of international stature with expertise in lupus. When asked whether there was something reasonable Time Warner could have done to accommodate Ms. Haschmann, he responded:

> I don't think she could have done this job. Either they would have had to give her something that didn't require as much thought or give her an extended furlough, months.

Tr. at 231. When asked to estimate the length of leave that might be anticipated, Dr. McCarty replied:

> No, you really can't tell that. I would have probably wanted to have her take three months off. That's a guess whether she'd be completely recovered three months or ever is anybody's guess. You really, it's called the diagnostic test of time. You really just have to let time go by.

Tr. at 232–33.

On March 24, 1996, the Social Security Administration determined that Ms. Hasch-

mann was entitled to disability benefits as of the date of her disability, September 21, 1995. By the time the benefits arrived, however, her disease was in remission, and Ms. Haschmann had found a new job. She therefore attempted to return the benefits. When the Social Security official refused to accept them, she placed the funds in a segregated account for later return.

On May 20, 1996, Ms. Haschmann began working with the Lutheran Brotherhood as a district sales representative. She testified that, out of 400 new sales people, she ranked 26th nationally. The problems she experienced at Time Warner—memory, concentration and cognitive problems—are gone.

## B. Proceedings before the District Court

Ms. Haschmann's complaint, originally filed in state court on November 27, 1995, was removed to federal court on January 5, 1996, by Time Warner. After the complaint was amended and answered and Time Warner's summary judgment motion was denied, a three-day trial before a jury was held beginning April 21, 1997. The case was submitted to the jury under the ADA and the FMLA. In a series of special verdicts, the jury found that Ms. Haschmann was discharged from her position because of her disability, that Time Warner did not make a good faith effort of reasonable accommodation of Ms. Haschmann's disability, and that Ms. Haschmann was terminated by Time Warner in violation of her rights under the FMLA. The jury awarded Ms. Haschmann $32,000 in back pay and $8,000 in compensatory damages. The district court entered judgment on the verdict. After a hearing on the parties' postjudgment motions, the court denied all motions except the plaintiff's mo-

---

She states that in December she felt that she was improving both with her cognitive function, memory, process time and physically but in 19. 6 again began to develop increasing neurologic problems. She states that she did have a fall in the bathtub when her left leg gave out from under her in late January. Her Methotrexate has been increased and she was given Depo–Medrol. The Prednisone is currently being adjusted as well.

At the present time she states that although she is better now cognitively than she was, she still

has problems with numbers, and in fact her husband takes care of the checkbook now. One must remember that this is a woman who has a CPA degree. She also states that she has extreme fatigue. She will sleep 12 hours at night and then need to sleep throughout the day. She noticed increasing weakness and clumsiness of her left side. She states that she was fired from her job because of her declining abilities.

Ex.7.

tion for attorney's fees and costs; on that matter, the court awarded the plaintiff $34,-855.37. Time Warner timely appealed.

## II

### DISCUSSION

■ The district court denied Time Warner's postverdict motion for judgment as a matter of law. On appeal, Time Warner seeks reversal of the judgment based on the jury verdict. As we have noted often, a party appealing a jury verdict faces an uphill battle, for we will not set aside a jury verdict as long as a reasonable basis exists in the record to support that verdict. *See Riemer v. Illinois Dept. of Transp.*, 148 F.3d 800, 805 (7th Cir.1998); *Van Stan v. Fancy Colours & Co.*, 125 F.3d 563, 567 (7th Cir.1997); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 545 (7th Cir.1997); *United Airlines, Inc. v. United States*, 111 F.3d 551, 553 (7th Cir.1997); *Futrell v. J.I. Case*, 38 F.3d 342, 346 (7th Cir.1994).

### A. "Qualified Individual with a Disability"

■ According to Time Warner, the facts of this case are so strong that reasonable persons in the exercise of impartial judgment could not conclude that Ms. Haschmann was a "qualified individual with a disability" under the ADA. Time Warner asserts first that Ms. Haschmann had failed to perform the essential functions of her position even before she had a disability that was cognizable under the ADA and certainly before the commencement of her September 21, 1995 medical leave. As Time Warner notes, Keating testified that her performance was inadequate from the time she was hired in April 1995 and Ms. Haschmann admitted that her performance was inadequate from July or August 1995. Moreover, Time Warner points out, her symptoms commenced around September 14, which was when LaFleur told her that she may have to look for a different job.[9] Time Warner contends that Ms.

Haschmann should not be allowed to invoke the ADA protections when her previous poor performance was an adequate ground for termination. We now turn to an assessment of those claims.

A person is a "qualified individual with a disability" if he or she is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment condition that such individual holds or desires." 42 U.S.C. § 12111(8). Therefore, to fall under the protection of the ADA as a "qualified person with a disability," a plaintiff must "satisf[y] the requisite skill, experience, education and other job-related requirements of the employment position" and must be able to "perform the essential functions of such position" with or without accommodation. 29 C.F.R. § 1630.2(m). Time Warner does not take issue with the first prong of this requirement and, on this record, no challenge to her skill and prior experience could be supported. Instead, Time Warner contends she was not able to perform the essential functions of her position at any point during her employment with the Green Bay Division. In its view, therefore, she was not qualified at the time of her discharge. *See Duda v. Board of Educ. of Franklin Park Pub. Sch. Dist. No. 84*, 133 F.3d 1054, 1059 (7th Cir.1998) (noting that the determination of a person's qualification under the ADA should be based on her "capabilities at the time of the employment decision").

■ We now turn to the evidence presented in this case, remembering to view it in the light most favorable to Ms. Haschmann, who prevailed at trial. As a threshold matter, we point out that the jury was certainly entitled to reject Time Warner's suggestion that Ms. Haschmann's disability somehow "commenced" around the time of her September flare. The record supports the inference that the severe symptoms Ms. Haschmann experienced in September 1995 were episodic manifestations characteristic of the lupus

---

9. To the extent that Time Warner is intimating that Ms. Haschmann's symptoms were contrived when she was told her job was in jeopardy, we find such a position without any support in the record. Ms. Haschmann had been under the care of a lupus specialist before she came to Green Bay, and none of the medical experts testifying in this case raised the slightest question concerning the existence and severity of her affliction.

from which she suffers, symptoms which lie dormant and flare from time to time. Our circuit recognizes that "[o]ften the disabling aspect of a disability is, precisely, an intermittent manifestation of the disability, rather than the underlying impairment." *Vande Zande v. Wisconsin Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir.1995). Such "an intermittent impairment that is a characteristic manifestation of an admitted disability is, we believe, a part of the underlying disability and hence a condition that the employer must reasonably accommodate." *Id.* Therefore, the jury was entitled to determine that Ms. Haschmann's episodic flares were simply part of her disability and part of what Time Warner had a duty to accommodate within reason.

Ms. Haschmann believed that her job performance was satisfactory in the first months; in addition, as the district court noted, Time Warner's claim that her performance was inadequate was not documented until the flare-up of her lupus. Following Ms. Haschmann's return from her first leave in September, after she explained to Keating and LaFleur the nature of her illness, Keating promised Ms. Haschmann that she would have the opportunity to improve her job performance once she regained her health. And yet, after she suffered a second relapse, Ms. Haschmann was fired. The only evidence of criticism concerning her performance between the time of her return to work after her initial treatment for lupus in September and her termination in November were Keating's two complaints: Keating criticized her for reporting to work early one morning and for attending a Chamber of Commerce dinner on behalf of Time Warner—a dinner Ms. Haschmann attended with her doctor's permission. Only after Ms. Haschmann sought a second medical leave of absence did Time Warner claim that she was not performing the essential functions of her job adequately. And within days after she sought medical leave, Time Warner fired

her.[10] In our view, there was a reasonable basis in the evidence for the jury to conclude that Ms. Haschmann was a qualified individual suffering from lupus who was able to perform her job adequately without accommodation until September 21, 1995, and who sought accommodation of medical leave after that time.

Time Warner suggests another reason why Ms. Haschmann was not a qualified individual with a disability: It contends that, as of the end of October 1995, there was no reasonable accommodation available which would have permitted Ms. Haschmann's continued employment. Under the ADA, the "term 'reasonable accommodation' may include ... (B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9). Time Warner asserted that it accommodated Ms. Haschmann's condition by providing her with an ergonomic keyboard for her computer and a special back support. It also gave her the leave she requested on September 21, 1995, but was not willing to grant her the additional leave she requested on October 26, 1995. One reason that Time Warner believed the additional leave to be unreasonable was that there was no way to predict when Ms. Haschmann would be able to return to work to perform her job. Time Warner insisted that it could not be expected to accept her attorney's estimate of 2–4 weeks of leave time and could not afford to give Ms. Haschmann unlimited leave, because the company would be left with essential functions unperformed for unpredictable periods of time. According to Time Warner, the Fourth Circuit has held that an employer is not required to provide unlimited leave as an accommodation under the ADA, and we should follow its decision in *Tyndall v. National*

---

**10.** *Cf. Davidson v. Midelfort Clinic, Ltd.*, 133 F.3d 499, 511 (7th Cir.1998) (noting that, when an "employer's adverse action follows fairly soon after the employee's protected expression," such a telling temporal sequence can indicate a causal link reflecting an employer's retaliatory animus; holding that 5–month period does not, by itself,

suggest a causal link); *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 797 (7th Cir.1997) (citing cases in which time period of 1 day or 1 week sufficiently demonstrated causal nexus; holding that McClendon's termination 2–3 days after his filing EEOC charges established sufficient causal link).

*Education Centers, Inc.*, 31 F.3d 209 (4th Cir.1994).

The record evidence from trial does not support Time Warner's assertions. In the first place, Ms. Haschmann's accommodation request was for a short leave of absence, not unlimited leave.[11] Ms. Haschmann's lawyer stated that the leave sought under the FMLA was 2–4 weeks, and her doctor stated that he was optimistic that the flare would be short-lived. In addition, there is no evidence in the record that Time Warner made any inquiry about what accommodation might be needed, available or reasonable. Ms. Haschmann authorized Keating and LaFleur to call Dr. Partain to discuss her condition and the length of leave she needed, but no call was made. Time Warner never asked an independent physician to evaluate Ms. Haschmann's prognosis and the reasonableness of her request for leave. Dr. Baumann, the industrial psychologist, testified that he would have counseled against terminating Ms. Haschmann after her lupus flare; however, he was not consulted either. *See* 42 U.S.C. § 12112(d)(4) (employer may inquire into employee's medical condition if inquiry is job-related and consistent with business necessity); 29 C.F.R. § 1630.14(c) (employer may inquire into ability of employee to perform functions related to his job). Instead, Time Warner decided summarily to fire Ms. Haschmann and now asserts that no accommodation could have been reasonable.

 In our view, there was sufficient evidence from which a reasonable juror could conclude that the second medical leave, as requested, would have been a reasonable accommodation. The reasonableness of a requested accommodation is a question of fact. *See Jankowski Lee & Assocs. v. Cisneros*, 91 F.3d 891, 896 (7th Cir.1996). The district court properly instructed the jury on the issue.[12] It also instructed that an employer could be required to provide an employee a reasonable medical leave of absence to recuperate but was not obligated to tolerate erratic, unreliable attendance or to provide an accommodation which would impose an undue hardship on the business.[13] Ms. Haschmann told Time Warner at length about her lupus and her request for medical leave. Under the ADA, "[o]nce an employer's responsibility to provide reasonable accommodation is triggered, the employer must engage with the employee in an 'interactive process' to determine the appropriate accommodation under the circumstances." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 563 (7th Cir.1996); see also 29 C.F.R. § 1630.2(*o*)(3); 29 C.F.R. Pt. 1630, App. § 1630.9. The record does not reflect any interaction; the only reciprocal response by Time Warner was a termination notice. We believe there certainly was a reasonable basis in the record for the jury's verdict on this issue.

This record does not support Time Warner's assertion that it would suffer an undue hardship if it granted Ms. Haschmann's proposal of a 2–4 week medical leave. There was evidence that the job had been vacant for many months before Ms. Haschmann was

---

11. The ADA provides that modified work schedules and part-time employment are broad types of reasonable accommodation which an employer may be required to provide. *See* 42 U.S.C. § 12111(9)(B). Ms. Haschmann did not seek modification of her schedule or hours; she simply asked for medical leave as a reasonable accommodation at that time.

12. The court's reasonable accommodation instruction, in pertinent part, included the following mandate:

You must decide in favor of the defendant if it demonstrates by a preponderance of the evidence that, one, the plaintiff informed the defendant that reasonable accommodations were needed because of her disability; two, the defendant made a good faith effort and consulted with the plaintiff to identify and make a reasonable accommodation that would provide the plaintiff with an equally effective opportunity; and, three, the reasonable accommodation would not cause an undo [sic] hardship on the operation of the defendant's business.
Tr. at 443.

13. We note, as well, that the jury was instructed on the meaning of qualified individual, the essential functions of a job, reasonable accommodation, and undue hardship. It was instructed that an employer is "not necessarily required to accommodate erratic and unreliable attendance at work by an employee with a serious medical condition" and that "reliable and regular attendance is an essential function of most management level jobs." Tr. at 442. No issue concerning the jury instructions was raised.

hired, that the company took almost six months to fill her position after her discharge, and that subordinates handled the job in the interim. We conclude that a jury reasonably could determine that her requested short-term leave of absence would not be an undue hardship on Time Warner to provide. Moreover, Time Warner's assertion that it could not tolerate the continued absence of an important executive is contradicted by Keating's promise that Ms. Haschmann would have an adequate opportunity to prove herself once she had regained her health. The jury was free to weigh the differing testimony of the witnesses and to consider Time Warner's medical leave policy, which promised that employees would be reinstated if they returned from a medical leave of absence within 12 weeks and would be given their old job if it was open or a similar job if it was not. Connie Haschmann's job was open on January 1, 1996, when Dr. Partain allowed her to return to work without restriction. Having heard the evidence, the jury reasonably could have concluded that Ms. Haschmann's request for a short medical leave was reasonable under the circumstances and that Time Warner's business could have sustained a brief period of her absence to accommodate her lupus flare.

In addition, we note that Time Warner's reliance on the Fourth Circuit Tyndall decision is unhelpful to its position. The facts in that case are readily distinguishable from those now before us. Tyndall was suffering from an advanced lupus condition and her son was disabled as well. The court acknowledged her employer's considerable accommodations to her, including numerous grants of extensive leaves. It then held that the employer was not required to accommodate her by modifying her teaching schedule when her absences were caused not by her own disability but rather by her personal need to tend to her son's disability, one which the employer was not obligated to accommodate. *See Tyndall*, 31 F.3d at 214. Our court has held that "[t]he ADA does not require an employer to accommodate an employee who suffers a prolonged illness by allowing him an indefinite leave of absence." *Nowak v. St. Rita High Sch.*, 142 F.3d 999, 1004 (7th Cir.1998). In that case, however, a high school teacher was absent 65+ school days and 3 examination days at the end of one school year, virtually all of the next school year, and the first 6 weeks of the third year, before the high school decided to terminate his employment. The difference in the periods of absence in *Nowak* and in this case clearly distinguishes the two cases. In this case, the leave of absence sought was a clearly defined period of 2–4 weeks and was Dr. Partain's estimated time of treatment. Nothing in the record indicates that Time Warner asked Dr. Partain if Ms. Haschmann would have the ability to do the essential functions of her job after that time period, with or without accommodation.

We do not dispute that a business needs its employees to be in regular attendance to function smoothly; the absence of employees is disruptive to any work environment. However, it is not the absence itself but rather the excessive frequency of an employee's absences in relation to that employee's job responsibilities that may lead to a finding that an employee is unable to perform the duties of his job. Consideration of the degree of excessiveness is a factual issue well suited to a jury determination. In *Nowak*, in which the teacher was absent more than 18 months, we upheld the employer's refusal to accommodate the teacher by allowing him an indefinite leave of absence. *See* 142 F.3d at 1004. In this case, Ms. Haschmann had taken sick leave in September 1995, had tried to return to work gradually, had suffered another flare, and then had requested further leave under the FMLA. A reasonable basis exists in the record for the jury's determination that Time Warner dismissed Ms. Haschmann without making a good faith effort of reasonable accommodation of her disability.

In sum, we conclude that there was substantial evidence in the record to justify the jury's conclusion that Time Warner's efforts at accommodation were inadequate, would not impose an undue hardship on the business, and would not require Time Warner to tolerate erratic attendance.

**B. Judicial Estoppel**

█ Time Warner next contends that, because she represented to the Social Security

Administration that she was unable to work, Ms. Haschmann should be estopped from claiming ADA benefits by representing that she was a qualified individual with a disability who could work with or without accommodation.

■■■ The doctrine of judicial estoppel is based upon the equitable principle that, "if a party wins a suit on one ground, it can't turn around and in further litigation with the same opponent repudiate the ground in order to win a further victory." *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir.1998); *see also DeGuiseppe v. Village of Bellwood*, 68 F.3d 187, 191 (7th Cir.1995). However, our circuit recognizes that the receipt of Social Security disability benefits does not preclude ADA relief because the two Acts employ quite different standards, procedures and objectives. *See McCreary v. Libbey–Owens–Ford Co.*, 132 F.3d 1159, 1164 (7th Cir.1998). A claimant seeking disability benefits under the Social Security statute must have a disability which is an "inability to engage in any substantial gainful activity." 42 U.S.C. § 423(d)(1)(A). However, an ADA claimant must be a "qualified individual with a disability," who is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). In recognition of such distinctions, we do not apply judicial estoppel to foreclose ADA claims when the claimant has applied for disability benefits.[11] *See McCreary*, 132 F.3d at 1164; Weigel v. Target Stores, 122 F.3d 461, 466–67 (7th Cir.1997); *Weiler v. Household Finance Corp.*, 101 F.3d 519, 523–24

(7th Cir.1996); *Overton v. Reilly*, 977 F.2d 1190, 1196 (7th Cir.1992). We conclude that the district court properly exercised its discretion in refusing to apply judicial estoppel based upon Ms. Haschmann's application for and receipt of Social Security disability benefits.

■■■ Nevertheless, the receipt of a Social Security disability benefit, while not dispositive, may be relevant to the issue whether a plaintiff under the ADA is a qualified individual with a disability. *See McCreary*, 132 F.3d at 1164–65; *Weigel*, 122 F.3d at 467; *Overton*, 977 F.2d at 1196. In this case, Ms. Haschmann had a serious lupus flare and was treated in September and October 1995. She was fired within a week of her October relapse, despite the fact that her physician believed she would be able to return to work after a brief leave of absence. After she was advised to file for Social Security disability benefits, she began filling out an application on November 7, 1995. Ms. Haschmann received chemotherapy and pulse therapy November 10 through 12 at a hospital. Several days after her treatment, she completed her Social Security forms. After her therapy, she experienced a continuous improvement in November and December, and her doctor released her to work on January 1, 1996. However, Ms. Haschmann's condition worsened again and she suffered another flare in February 1996. She was in that flare when Dr. Rieder examined her on behalf of the Social Security Administration on February 12, 1996. Following that examination, the Social Security Administration declared her eligible for benefits. When her benefits arrived in March 1996, however, Ms. Hasch-

---

14. Although the circuits employ different articulations of their tests, the vast majority of courts have declined to hold that an ADA plaintiff is judicially estopped to prove her ADA claim simply because she has sought or received Social Security disability benefits. *See, e.g., Rascon v. U S West Communications, Inc.*, 143 F.3d 1324, 1332 (10th Cir.1998); *Johnson v. Oregon*, 141 F.3d 1361, 1367 (9th Cir.1998); *Moore v. Payless Shoe Source, Inc.*, 139 F.3d 1210, 1212 (8th Cir.1998); *Griffith v. Wal–Mart Stores, Inc.*, 135 F.3d 376, 383 (6th Cir.1998), *pet'n for cert. filed*, 66 U.S.L.W. 3800 (U.S. June 9, 1998) (No. 97–1991); *Talavera v. School Bd.*, 129 F.3d 1214, 1220 (11th Cir.1997); *Cleveland v. Policy Mgmt. Sys. Corp.*, 120 F.3d 513, 518 (5th Cir.1997),

*pet'n for cert. filed*, 66 U.S.L.W. 3435 (U.S. Dec. 15, 1997) (No. 97–1008); *Swanks v. Washington Metro.* Area Transit Auth., 116 F.3d 582, 586–87 (D.C.Cir.1997). But *see McNemar v. Disney Store, Inc.*, 91 F.3d 610 (3d Cir.1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 958, 136 L.Ed.2d 845 (1997) (holding that an individual's statement to the SSA that he was disabled and unable to work barred his subsequent ADA claim), and *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 nn. 3–5 (3d Cir.1997) (noting criticism of *McNemar*; limiting *McNemar* to its facts; stating that "[c]ourts should not assume that *McNemar* always bars an individual's ADA claims merely because prior representations or determinations of disability exist in the record").

mann's lupus was in remission and she was working again. On that basis she attempted to return the Social Security benefits and has placed them in a separate fund for their eventual return.

The district court carefully evaluated these facts. It recognized that Ms. Haschmann was advised to seek Social Security benefits after she was terminated and that she did not use the funds once she was fit to work. It ruled that the doctrine of judicial estoppel should not be applied in this case. That ruling is consistent with the case law of this circuit and is supported by the facts of record.

### C. The Family and Medical Leave Act

It was the jury's verdict that Ms. Haschmann was terminated in violation of the Family and Medical Leave Act. Time Warner claims that there was no evidence that Ms. Haschmann's termination violated the FMLA; it takes the view that Ms. Haschmann was terminated for poor performance, a matter wholly unrelated to the FMLA. Time Warner contends that the FMLA should not be construed as erecting a barrier to terminations for cause, the characterization that it attributes to Ms. Haschmann's discharge.

The FMLA provides leave for qualified employees who must be absent from work for family or medical reasons. *See* 29 U.S.C. § 2601(b)(2); *Price v. City of Fort Wayne*, 117 F.3d 1022, 1024 (7th Cir.1997) (noting that the FMLA recognizes "that there will be times in a person's life when that person is incapable of performing her work duties for medical reasons"). The FMLA's goal is to provide a leave allotment for someone suffering from a serious health condition, which is defined under the FMLA as "an illness, injury, impairment, or physical or mental condition that involves—(A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11); *see Price*, 117 F.3d at 1023 (concluding that several temporally linked diagnoses, taken together, can constitute a serious health con-

dition). The Act allows an eligible employee [15] to take up to 12 weeks of leave during any 12–month period for specified circumstances which include "a serious health condition that makes the employee unable to perform the functions of [her] position." 29 U.S.C. § 2612(a)(1)(D). An eligible employee returning from an FMLA leave is entitled to reinstatement. *See id.* § 2614(a)(1); *see also Moore v. Payless Shoe Source, Inc.*, 139 F.3d 1210, 1213 (8th Cir.1998). The regulations delineating the FMLA require employees to provide adequate notice to their employers of the need to take leave, but if the need arises unexpectedly the notice should be given "as soon as practicable." 29 C.F.R. §§ 825.302–.303.

In essence, Time Warner is asking us, as it has throughout this appeal, to re-weigh the evidence presented to the jury and to find (1) that Ms. Haschmann was terminated because she did not perform the essential duties of her job and (2) that there was no evidence of a causal connection between her request for FMLA leave and her firing. However, the task before us, in the face of a jury verdict, is to determine whether there is a reasonable basis for the verdict in the record. As we determined above, taking the evidence in the victor's favor, a jury reasonably could find that Ms. Haschmann was performing her job properly for a number of months, that the mistakes she began making (for which she was criticized by Keating) were related to her illness, that she showed adequate job performance after she returned to work from her first flare, that Keating had promised her a fair opportunity to do her job once she returned to work full time, that Ms. Haschmann's request for a second medical leave was accompanied by notice invoking the FMLA, and that the timing of Keating's firing of Ms. Haschmann (days after her request for medical leave) was not merely a coincidence. *See Price*, 117 F.3d at 1026 (noting that whether Price gave notice that was proper and timely was question of fact); *Cf. Hunt–Golliday v. Metropolitan Water Reclamation Dist.*, 104 F.3d 1004, 1014 (7th Cir.1997) (suspicious timing constitutes cir-

---

**15.** An employee is eligible for the leave if she has at least 1250 hours of service during the 12 months prior to commencement of leave. 29 U.S.C. § 2611(2)(A).

cumstantial evidence that supports a discrimination claim). Moreover, the firing was carried out in spite of Ms. Haschmann's doctor's note that she take leave and the notice from her attorney that she was claiming her right to medical leave under the FMLA. *See Price*, 117 F.3d at 1025 (a request for leave for medical reasons, accompanied by a doctor's note requiring her to take the time off, was sufficient notice to an employer). In fact, under the FMLA it was the employer's responsibility at that point to inquire further. *See* 29 C.F.R. § 825.303(b); *Price*, 117 F.3d at 1026. Time Warner made no inquiry concerning Ms. Haschmann's medical prognosis or probable leave time before firing her. These factors could cause a jury reasonably to believe that Time Warner's reason for firing Ms. Haschmann—poor performance— was not the real one. Under Time Warner's own policy, Ms. Haschmann had the right to this leave and to reinstatement in her job, upon her return, if it was available. We hold that the evidence presented and the reasonable inferences from it, viewed in a light most favorable to Ms. Haschmann, who prevailed before the jury, sufficiently supported the jury's verdict that Time Warner violated the FMLA.

### Conclusion

For the reasons discussed above, we hold that there was sufficient support in the record for a jury reasonably to find that Ms. Haschmann was a qualified individual with a disability under the ADA, that Time Warner failed to provide her reasonable accommodation for her disability under the ADA, and that Time Warner violated the FMLA. In addition, we hold that the district court did not abuse its discretion by refusing to apply the principle of judicial estoppel to Ms. Haschmann's ADA claim on the ground that she had successfully applied for Social Security disability benefits. The judgment of the district court is affirmed.

AFFIRMED