In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2064

Amy Kohls,

Plaintiff-Appellant,

v.

Beverly Enterprises Wisconsin, Inc. d/b/a
Maple Manor Healthcare,

Defendant-Appellee.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 99 C 442--Barbara B. Crabb, Chief Judge.

Argued October 31, 2000--Decided August 1, 2001


   Before Bauer, Kanne, and Rovner, Circuit
Judges.

   Kanne, Circuit Judge.  Plaintiff-
appellant Amy Kohls claims that her
employer, Beverly Enterprises Wisconsin,
Inc. d/b/a Maple Manor Healthcare
("Beverly"), failed to reinstate her at
the conclusion of her maternity leave in
violation of the Family and Medical Leave
Act ("FMLA")./1 We find that Kohls has
not proven that Beverly violated her
rights under the FMLA and thus we affirm
the district court's grant of summary
judgment for Beverly.

I.  History

   Beverly owned and operated Maple Manor
Healthcare ("the Manor"), a residential
nursing home and rehabilitation facility
located in New Richmond, Wisconsin. Kohls
began working as the Manor's Activities
Director in May 1997 and was responsible
for planning, implementing, and
overseeing activities for the Manor
residents. She was a full-time, at-will
employee. During her time at the Manor,
several different executive directors
reviewed Kohls' performance, including
Bob Larson, Becky Olson, and Luanne
Flick. Though Larson gave plaintiff an
overall rating of above average in May
1998, he did note that she needed to

improve her performance in developing the weekend activity schedule and increasing volunteer membership. Olson served as interim executive director during thesummer of 1998, and she classified plaintiff's work as "marginal." Flick became the executive director in August 1998 and made favorable comments about plaintiff's job performance.

During the summer of 1998, the State of Wisconsin conducted a survey of the Manor that identified deficiencies in all of the Manor's departments, including the activities department. For example, residents had complained to the surveyors about the lack of activities at night and on the weekends. Flick met with Kohls on August 17, 1998 to review the survey results, and they discussed the lack of evening programming, the general lack of program variety, and the fact that mail was not distributed on the weekends. Plaintiff acknowledged that she could improve on these areas, and she agreed to arrange Saturday mail delivery and to work two evenings a week to allow for more evening activities. Flick mentioned some concern about the amount of programming but did not request Kohls to make changes. The Resident Council report from September 18, 1998 indicated that new weekend programs were implemented and that the residents were pleased.

Towards the end of September, Kohls requested FMLA leave from September 28, 1998 until December 1, 1998, which Flick granted. Flick was receptive to the request: she did not question Kohls about the dates selected, hassle her about the length of time requested, or make any disparaging comments. Beverly hired a full-time, temporary replacement, Shelly Price, to fill Kohls' position while she was on leave. Several residents, residents' family members, and Beverly employees complained to Price about Kohls' programming, though Price did not share any of the comments with Flick. Price herself criticized the quantity and quality of Kohls' programs and implemented numerous changes: she adapted some of Kohls' programs, stopped using some, and added others. At least four residents told Price they did not want her to leave because they preferred her programming to Kohls'. Flick commented two or three times during Kohls' maternity leave that she wished Price

could be the Manor's permanent Activities Director.

Flick asserts that, prior to the time Kohls took leave, nursing assistants, several residents, and several residents' family members communicated their dissatisfaction with the activities program at the Manor. Flick did not make any written record of the complaints, however, and could only recall the name of one such person. Flick also asserts that games and activity supplies were outdated or worn out and had to be replaced by Price, that Kohls did not recruit a sufficient number of volunteers, and that Kohls had no accessible list of volunteers. Kohls admitted that there was no active volunteer listing available, but she contests the other accusations. Price's deposition testimony indicates support for Kohls' view: Price did not recall purchasing any new games or supplies, and she felt that the number of volunteers was not a concern (though two volunteers started while she was director).

Shortly after Kohls began her leave, Flick became concerned about the status of the Resident Council checking account, a trust fund containing residents' money for which Kohls maintained the checkbook. As it turned out, Kohls had told Price that there were errors in the checkbook just prior to the time she took leave. Kohls has since admitted that she did not record dates and check numbers for every entry, that she did not routinely reconcile the bank statements against the check register, that she threw away the bank statements rather than maintain a record, that her checkbook entries did not explain the purpose for checks written to "cash," and that a check for $30.93 was not accounted for. Because the account is considered a trust account, Flick was legally required to report any suspected misappropriation of funds but she did not do so, nor did she contact Kohls about her concerns.

Flick called Kohls twice during her maternity leave to ask her to attend certain meetings so she would be up to speed when she returned to work. During the first call, Flick told Kohls she would like her to attend an all-day conference in River Falls, Wisconsin. Kohls agreed to attend and brought her

newborn baby with her. Then, in mid-November, Flick asked Kohls to attend another all-day conference, this time in Hayward, Wisconsin. Kohls told Flick she did not think she could go, as it would entail twelve hours away from her nursing infant. Flick became abrupt and retorted, "How is that going to change in two weeks when you come back?" Notwithstanding the outburst, Flick agreed that Kohls could attend the same conference in December after she returned to work.

Prior to her return, Kohls received a call from Olson advising her to apply elsewhere for employment. Olson told Kohls that she thought Flick "was going to give [Kohls] a hard time when she came back." Nonetheless, Kohls returned to work on November 30, 1998. She resumed her normal duties and went to a departmental meeting at 9 a.m. Afterward, Flick asked Kohls if she would be able to meet later that day. During that meeting, at which Olson was present, Flick asked Kohls if she had applied for another job. Kohls replied in the negative. Flick then informed Kohls that she had received complaints from relatives of residents and volunteers about Kohls' work as Activities Director. Flick also accused her of embezzlement, basing the accusation on the fact that dates and check numbers were missing from the check register and that the balance in the checkbook was different from the bank's balance by $70.86. Flick presented Kohls with a copy of the checkbook but did not give Kohls any time to look through it. When Flick was not satisfied with Kohls' explanation of the checkbook situation, Flick told Kohls that she had the option to resign or to be terminated because of misappropriation and mishandling of funds. Kohls initially agreed to resign but later rescinded the resignation and told Flick that she would have to fire her. Flick did so, citing the alleged misappropriation and job performance as reasons for the termination./2

At all relevant times, Beverly had a written discipline policy dividing prohibited behavior into two categories. Misappropriation of funds is characterized as a category one violation while performance concerns are a category two violation. In the event of a category one violation, the policy requires an employee to be immediately suspended

without pay pending an investigation. The investigation must include interviews with all witnesses as well as an opportunity for the employee to give her side of the story. Beverly's Human Resources Manager must also be consulted and advised of the investigation's results. The Executive Director ultimately decides whether discharge is appropriate, though the HR Manager has input into the decision. For category one violations, progressive discipline is to be employed so that the employee has the opportunity to change his or her behavior. The policy states, however, that these disciplinary policies are not absolute.

The discipline and counseling procedures set forth below articulate factors and procedures that Beverlybelieves are generally appropriate to govern employee conduct and performance. Provisions of these procedures are not, however, absolute rules. In each case of misconduct or poor performance, the appropriate discipline or counseling action will be determined at Beverly's discretion on the basis of the particular facts or circumstances.

Beverly also has a separate discharge policy which states: "No discharge will occur without the proper investigation of the misconduct to determine if discharge is appropriate." What constitutes a proper investigation is not specified.

Kohls filed suit in Wisconsin state court, alleging that Beverly failed to restore her to the position of Activities Director in violation of the Family and Medical Leave Act, 29 U.S.C. sec. 2614(a)(1). Beverly removed to the United States District Court for the Western District of Wisconsin pursuant to 28 U.S.C. sec. 1441, and subsequently moved for summary judgment. In reviewing defendant's motion, the district court focused on "whether plaintiff had shown that a jury could conclude that her firing was motivated by her . . . use of leave." Kohls v. Beverly Enter. of Wis., Inc., No. 99-C-442-C, slip op. at 2 (W.D. Wis. March 27, 2000). The court answered this question in the negative and granted Beverly's motion for summary judgment. See id. Kohls appeals only that portion of the summary judgment decision dismissing her FMLA claim.

II.  Analysis

The FMLA provides eligible employees with certain substantive rights, and it is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided." 29 U.S.C. sec. 2615(a)(1). Plaintiff alleges that Beverly denied her right to be reinstated. The FMLA provides, with one minor exception not applicable here, that "any eligible employee who takes leave . . . shall be entitled, on return from such leave--(A) to be restored by the employer to the position of employment held by the employee when the leave commenced; or (B) to be restored to an equivalent position." 29 U.S.C. sec. 2614(a)(1). Eligible employees are thus entitled to reinstatement. See id.; Haschmann v. Time Warner Entm't Co., 151 F.3d 591, 604 (7th Cir. 1998). The substantive right provided in sec. 2614(a)(1), however, "shall [not] be con strued to entitle any restored employee to . . . any right, benefit, or position of employment other than any right, benefit or position to which the employee would have been entitled had the employee not taken the leave." sec. 2614(a)(3)(B); see also Rice v. Sunrise Express, Inc., 209 F.3d 1008, 1017-18 (7th Cir. 2000), reh'g en banc denied, 217 F.3d 492, cert. denied, ___ U.S. ___, 121 S. Ct. 567, 148 L. Ed. 2d 486 (2000). The right to reinstatement is therefore not absolute.

When an employee alleges that the employer interfered with her substantive rights under the FMLA, we require her to "establish[ ], by a preponderance of the evidence, that [s]he is entitled to the benefit [s]he claims." Diaz v. Fort Wayne Foundry Corp., 131 F.3d 711, 713 (7th Cir. 1997). The employer may then present evidence to show that the employee would not have been entitled to her position even if she had not taken leave. See Rice, 209 F.3d at 1018 (quoting O'Connor v. PCA Family Health Plan, Inc., 200 F.3d 1349, 1354 (11th Cir. 2000) (holding that "the employer has an opportunity to demonstrate that it would have discharged the employee even if she had not been on FMLA leave")). The employee must then overcome the employer's assertion, as she carries the burden of demonstrating her right to the entitlement. See id.; but

see id. at 1019 (Evans, J. dissenting); Rice v. Sunrise Express, Inc., 217 F.3d 492, 493 (7th Cir. 2000) (Diane P. Wood, J. dissenting from denial of reh'g en banc); 29 C.F.R. sec. 825.216(a)(1) (explaining that "[a]n employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment"). Thus, Kohls must show that she was entitled to be reinstated as the Manor's Activities Director, which means she must prove that Beverly would not have discharged her had she not taken FMLA leave. See Rice, 209 F.3d at 1018.

As indicated by the statute, an employer can refuse to restore an employee to their former position when restoration would confer a "right, benefit, or position of employment" that the employee would not have been entitled to if the employee had never left the workplace. 29 U.S.C. sec. 2614(a)(3)(B). For example, if an employee was hired only for a discrete project, and that project was completed while the employee was on leave, then the employer has no obligation to restore the employee. See 29 C.F.R. sec. 825.216(b). The regulations also state that an employee who is laid off during the course of her leave has no right to reinstatement. See id. at (a)(1). With no absolute right to reinstatement, whether an employer violates the FMLA turns on why the employee was not reinstated. Clearly, an employee may not be fired because she took leave--that would be in direct violation of the statute. See 29 U.S.C. sec. 2615(a)(2). However, an employee may be fired for poor performance when she would have been fired for such performance even absent her leave. See Clay v. City of Chi. Dep't. of Health, 143 F.3d 1092, 1094 (7th Cir. 1998).

Kohls asserts that she would not have been fired had she not taken leave and was thus entitled to reinstatement. Beverly counters by claiming that Kohls would have been terminated regardless of whether or not she took maternity leave, due to the problems with the Resident Council checkbook and the activities program. We find that Beverly has presented sufficient evidence to support its assertion that Kohls was terminated for the stated reasons. Kohls admitted

that at least one check was not accounted for, that she did not consistently record check numbers or amounts, that she threw out the bank statements, and that she did not balance the checkbook. Kohls has not suggested that Flick was lying when she stated that the checkbook was off by $70.86 nor has Kohls presented any explanation for the difference. With respect to the performance issues, it is clear from the record that numerous parties commented on the deficiencies in the activities department under Kohls. While it is not as clear how much of this had been communicated directly to Flick, it is undisputed that she was aware of the problems, and had even discussed them with Kohls (following the state survey). An employer undoubtedly has the discretion to fire an at-will employee for mishandling and mismanaging funds or for poor performance, or both. See Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 678-79 (7th Cir. 1997) ("[N]o federal rule requires just cause for discharges.") (quotation omitted). It is possible, of course, that Flick would have disciplined Kohls less severely--by choosing something other than immediate termination--if there had not been another employee ready to take Kohls' place. Our role is not, however, to tell employers how to discipline employees; rather, it is to ensure that the process is not discriminatory. See id.

Yet there is an additional twist: Beverly did not decide to fire Kohls until some time after she took leave./3 Cf. Santos v. Knitgoods Workers' Union, Local 155, 252 F.3d 175, 178-79 (2d Cir. 2001) (discussing case in which employee had no right to reinstatement because the employer had already decided to terminate the employee prior to the time the employee took leave). We can imagine circumstances in which the timing of this decision could lead a fact finder to infer that the employee would not have been fired absent her taking of leave (if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware). Cf. Clay, 143 F.3d at 1094 (recognizing that the employee was discharged "solely because of her work deficiencies known to defendants prior to her leave" yet still

finding that "plaintiff was discharged for poor performance rather than for taking a medical leave"). Here, however, it is clear that the employer did not discover many of the deficiencies in Kohls' work--particularly with respect to the checkbook--until after Kohls took leave. The fact that the leave permitted the employer to discover the problems can not logically be a bar to the employer's ability to fire the deficient employee.

Ultimately, Kohls asserts that she was fired not due to problems with the checkbook or her performance, but rather because Flick liked plaintiff's replacement better. She thus asserts that Beverly's reasons for firing her are merely pretext for discrimination. While we do review "whether the employer's description of its reasons is honest," Gustovich v. AT&T Communications, Inc., 972 F.2d 845, 848 (7th Cir. 1992), the employee's burden is to prove a violation of the FMLA. Thus, pretext may have evidentiary value, but showing pretext does not necessarily satisfy the employee's burden. See Diaz, 131 F.3d at 713 (comparing the use of pretext in the FMLA context with the use of pretext in the McDonnell Douglas burden-shifting scheme); cf. Haschmann, 151 F.3d at 604-05 (finding sufficient evidence for a jury to conclude that the plaintiff-employee was not terminated for poor performance, as the employer contended, but rather was terminated in violation of the FMLA).

Kohls points to Flick's openly acknowledged wish that Price could be the Manor's permanent Activities Director as evidence that Kohls was not fired for the checkbook or performance related problems. Yet Flick's preference for Price does not itself demonstrate that Kohls would not have been terminated if she had not taken leave. Beverly would have been entitled to fire Kohls for mismanagement and mishandling of funds regardless of whether she had taken leave or not. Further, the facts support Beverly's contention that Flick, numerous residents, residents' family members, and other employees all preferred Price due to her successful activities programs. Nothing in the record indicates that Flick preferred Price for any reason related to Kohls' taking of leave.

Kohls asserts that if she had really been fired for the stated reasons, Flick would have followed Beverly's policies pertaining to termination. Kohls is correct that Flick did not follow the discipline and counseling procedures set forth in its written discipline policy (requiring suspension without pay, an investigation with witnesses, and so forth). However, as noted above, the procedures outlined in Beverly's policy were only a guide and did not have to be followed in all instances. It was in the discretion of the executive director, Flick, to terminate Kohls on the spot rather than initiate the formal process. As we have stated many times, our role is not to make suggestions to managers on how to deal with employees more fairly or effectively--we leave that to a company's personnel department. See Dale v. Chi. Tribune Co., 797 F.2d 458, 464 (7th Cir. 1986) ("This Court does not sit as a super-personnel department that reexamines an entity's business decisions.").

Beverly has asserted that Kohls' deficiencies were the reason for her termination and that she would have been terminated regardless of her leave, and Kohls has not presented sufficient evidence for a fact finder to conclude otherwise. While we recognize the difficulty of an employee's burden in this respect, our court has ruled on the appropriateness of this burden, see Rice, 209 F.3d at 1018, and we decline plaintiff's request to reconsider that decision.

III.  Conclusion

We find that Amy Kohls has not proven that she was entitled to be restored to her position as the Manor's Activities Director following her FMLA leave. The district court's grant of summary judgment for the defendant-appellee, Beverly Enterprises Wisconsin, Inc., is thus AFFIRMED.

FOOTNOTES

/1 Plaintiff's district court complaint also alleged that Beverly fired her in retaliation for taking FMLA leave and violated her rights under Title VII of the Civil Rights Act of 1964, though she has not pursued these claims on appeal.

/2 The termination form completed by Flick for Kohls indicates that Kohls was involuntarily terminated for "job performance" and "conduct." A note expounded on the reasons: "misappropriation/mis-handling of Resident Council checkbook [and] funds--inadequate activities programming to meet the needs of all residents."

/3 The timing of the decision is not clear in the record; we do not know whether Flick had already decided to fire Kohls before she returned from leave or whether the decision was made the day Kohls returned to work, during the meeting on November 30, 1998.