In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 00-3779 & 01-1546

JERRY OGBORN,

*Plaintiff-Appellant,*

*v.*

UNITED FOOD AND COMMERCIAL WORKERS UNION,
LOCAL NO. 881 and STEVEN POWELL,

*Defendants-Appellees.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 C 4623—**William T. Hart**, *Judge.*

ARGUED NOVEMBER 9, 2001—DECIDED SEPTEMBER 27, 2002

Before MANION, KANNE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Jerry Ogborn sued his former employer, Local 881 of the United Food and Commercial Workers Union, as well as the union's vice president, Steven Powell, alleging that Local 881 fired him in violation of the Americans with Disabilities Act, 42 U.S.C. §§ 12101-17, and the Family and Medical Leave Act, 29 U.S.C. §§ 2601-54, and that the union and Vice President Powell committed various torts in connection with Ogborn's termination. The district court granted summary judgment for Local 881 on the federal claims, relinquished supplemental jurisdiction over the state-law claims, and in a sep-

arate order assessed costs against Ogborn. In these consolidated appeals Ogborn concedes the dismissal of the state-law claims but contests both the grant of summary judgment on his federal claims and the award of costs, and as to both we affirm.

Ogborn worked as a business agent for Local 881 from 1989 to 1997 and for predecessors of Local 881 from 1980 to 1989. Local 881 represents in collective bargaining approximately 39,000 union members employed primarily in the retail grocery industry. As a business agent Ogborn visited stores represented by Local 881, met with union members about working conditions, filed and processed members' grievances, and performed a variety of other services on behalf of the union's constituents. From 1990 to 1997 Ogborn received four performance-based salary increases as well as letters from members thanking him for his work, but during the same period he was counseled frequently and suspended three times for poor performance.

One of Local 881's criticisms centered on Ogborn's filing and processing of members' grievances. Grievance processing, according to Local 881, constituted one of Ogborn's primary job responsibilities because delaying or failing to file a member's grievance could subject the union to liability in an unfair labor practices lawsuit. According to documents in Ogborn's personnel file, his supervisors criticized him in 1994 for failing to write timely grievances and noted that his grievance processing reflected "[o]ne of the poorest records of the entire field staff." In 1995 another supervisor criticized Ogborn for failing to promptly update three members on the statuses of their pending grievances, and in July 1996 the union suspended Ogborn for three days after a member lost his job and Ogborn neglected to learn the reason for the member's termination or to timely resolve his grievance. In July 1996 Ogborn also began having problems in his personal

life. Marital difficulties caused him to file for divorce, and he moved with his fifteen-year-old son into his parents' home. Ogborn, then 45 years old, lost weight, felt dejected, and experienced difficulty eating, sleeping, concentrating, thinking, and interacting with others.

A year later Ogborn again had problems at work. In July 1997 Vice President Powell directed Ogborn to start writing more detailed grievances and to stop having his girlfriend type his grievances because she was employed at one of the stores that Ogborn represented. On August 20 Powell and another supervisor again met with Ogborn and voiced concerns about his request for time off on a day when he knew that he needed to attend a mandatory organizing seminar, his relationship with the woman who had been doing his typing, his lack of familiarity with the names of many managers at stores that he represented, his failure to process any grievances since meeting with Powell six weeks earlier, and his processing of only 28 grievances for the year, less than half as many as previous business agents who worked the same stores. Because of these problems, Powell suspended Ogborn for three days and suggested that he should start looking for a new job because "one more instance" of poor performance would result in his termination.

At the meeting Powell also suggested that Ogborn should see a doctor if he thought that medical assistance would improve his work. According to Ogborn, at the time he was concentrating poorly, eating and sleeping with difficulty, and losing weight, so he took Powell's advice and visited Dr. Dan Clark, a family practitioner, on August 25—the day that his suspension ended. Dr. Clark diagnosed Ogborn with clinical depression, prescribed Prozac and sleeping pills, and instructed him not to drive or return to work. Ogborn promptly reported the diagnosis to Local 881 and informed the union that he would be off work until his next appointment with Dr. Clark in two

weeks. After meeting with Ogborn as scheduled on September 8, Dr. Clark concluded that Ogborn still suffered from depression and prescribed Elavil (a mood elevator), and Ogborn again told Local 881 that he would miss work for another two weeks. Then on September 20 Ogborn's ex-wife called the police and reported that Ogborn was "crazy and suicidal." An ambulance took Ogborn to the hospital, and emergency-room physicians observed him for several hours before releasing him with the recommendation that he see a counselor, whom Ogborn met with once. Two days later Ogborn saw Dr. Clark as scheduled, and he prescribed the antidepressant Serzone in lieu of Prozac because the Prozac was not working. Ogborn then reported the treatment change to Local 881 and advised the union that he would be off work for another two weeks.

Meanwhile, after learning of Ogborn's depression, Vice President Powell assigned another business agent to cover Ogborn's territory during his absence. Powell also instructed Ogborn to return his outstanding files, including the file for a member named Roger Ferrera. Another union employee then went to Ogborn's house and picked up the documents, and after reviewing the files officials at Local 881 allegedly discovered that Ogborn had not properly filed and processed a number of members' grievances. The union also purportedly received calls from members complaining that Ogborn had not completed their grievances or returned their telephone calls. According to Lisa Cantanzaro, one of Ogborn's supervisors, she personally received several calls from Roger Ferrera about six of his grievances as well as a call from a member named Janice Calise about her grievance. Cantanzaro testified that Ogborn had not properly processed these grievances and that she resolved them herself. Union officials then met twice to discuss the information uncovered after Ogborn took medical leave, and after a third

meeting the union's president, Ronald Powell (Vice President Steven Powell's brother), fired Ogborn on October 3, 1997.

After his termination Ogborn continued to meet with Dr. Clark. According to Ogborn, switching his medication to Serzone "seemed to help," and on October 23 he filed an application for unemployment insurance, certifying that he could "accept work now." Ogborn also unsuccessfully appealed President Powell's decision to fire him to the union's executive board. Ogborn then filed a charge of discrimination with the EEOC, and after receiving a right-to-sue letter, he brought this action. On Local 881's motion the district court granted summary judgment on Ogborn's claims under the ADA and the FMLA and later ordered Ogborn to pay $3,965.46 in costs. We review the court's grant of summary judgment on the federal claims de novo and review the award of costs for abuse of discretion. *Corder v. Lucent Techs. Inc.*, 162 F.3d 924, 927-28 (7th Cir. 1998).

On appeal Ogborn first contests the grant of summary judgment on his ADA claim. The ADA makes it unlawful for covered entities (such as labor organizations) to discriminate against disabled individuals by firing them because of their disabilities or by failing to make "reasonable accommodation" for their disabilities. 42 U.S.C. § 12112(a), (b)(5)(A); *Basith v. Cook County*, 241 F.3d 919, 926-27 (7th Cir. 2001). A disability in turn encompasses a physical or mental impairment that substantially limits someone in one or more "major life activities" as well as the status of "being regarded as having such an impairment." 42 U.S.C. § 12102(2); 29 C.F.R. § 1630.2(g); *see Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 122 S. Ct. 681, 689 (2002). According to Ogborn, his depression substantially limited him in the major life activity of working, *see Sinkler v. Midwest Prop. Mgmt. Ltd. P'ship*, 209 F.3d 678, 684 n.1 (7th Cir. 2000); 29 C.F.R.

§ 1630.2(i), and by firing him during his medical leave, Local 881 both discriminated against him because of his depression and also failed to accommodate his depression by honoring his request for time off work.

The problem with Ogborn's claim, as the district court pointed out, is that he has not identified any evidence that his depression limited his ability to work for more than a short period of time. Major depression can constitute a disability under the ADA. *Krocka v. City of Chicago*, 203 F.3d 507, 512 (7th Cir. 2000); *Schneiker v. Fortis Ins. Co.*, 200 F.3d 1055, 1061 (7th Cir. 2000); *Mustafa v. Clark County Sch. Dist.*, 157 F.3d 1169, 1174 (9th Cir. 1998) (per curiam). But intermittent, episodic impairments such as broken limbs and appendicitis are not disabilities, *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 544 (7th Cir. 1995); *Pollard v. High's of Baltimore, Inc.*, 281 F.3d 462, 468 (4th Cir. 2002) (collecting cases); 29 C.F.R. pt. 1630, App. § 1630.2(j), nor are isolated bouts of depression, *Soileau v. Guilford of Me., Inc.*, 105 F.3d 12, 16 (1st Cir. 1997).

In Ogborn's case the record reflects that depression prevented him from working for just over eight weeks—the period stretching from August 25, 1997, when Dr. Clark made his diagnosis, until October 23, 1997, when Ogborn certified in his application for unemployment insurance that he could return to work. True, Ogborn first suffered symptoms of depression after his divorce in July 1996, more than a year before Local 881 fired him, and it is unclear if Ogborn continued to suffer symptoms of depression after he applied for unemployment insurance. Nevertheless, merely having an impairment, such as depression, does not make an individual disabled under the statute. A claimant must also demonstrate that the impairment limits a major life activity—in Ogborn's case the activity of working. *See* 42 U.S.C. § 12102(2)(A); *Toyota Mfg.*, 122 S. Ct. at 690; *Sutton v. United Air Lines,*

*Inc.*, 527 U.S. 471, 482-83 (1999). Here Ogborn has not identified any evidence that depression limited his ability to work before his suspension and subsequent visit to Dr. Clark in August 1997; indeed, Ogborn testified at his deposition that when he went to see Dr. Clark he thought that he could still perform his job. Likewise, he has failed to point to any evidence that he could not work after October 23, when he certified that he could work.

Ogborn responds that even if his depression did not amount to an actual disability, the ADA still protects him because he was "regarded as" having a disability by officials at Local 881. *See* 42 U.S.C. § 12102(2)(C); *Dvorak v. Mostardi Platt Assocs., Inc.*, 289 F.3d 479, 483-84 (7th Cir. 2002). That contention is also unpersuasive, however, because Ogborn has not presented evidence that union personnel held exaggerated views about the seriousness of his illness. The record at most establishes that in August 1997 Vice President Powell suggested to Ogborn that he see a doctor, that union officials thereafter learned that Ogborn was depressed and would be off work, and that from August 25 to October 3, when Ogborn was fired, he contacted the union biweekly and reported his condition. These facts do not suggest that anyone at Local 881 thought that Ogborn's depression prevented him from working for a length of time in excess of the actual period that he was on medical leave. The district court therefore appropriately granted summary judgment on Ogborn's ADA claim.

Turning to the FMLA claim, we again agree that summary judgment was proper. The FMLA entitles eligible employees to up to twelve weeks of unpaid leave annually for serious health conditions and makes it unlawful for an employer to refuse to reinstate, or to discriminate against, an employee who takes valid leave. 29 U.S.C. §§ 2612(a)(1), 2614(a)(1), 2615(a)(2); *Ragsdale v. Wolverine World Wide, Inc.*, 122 S. Ct. 1155, 1160 (2002). The right

to reinstatement provided by the FMLA is not absolute, however, for the statute does not confer benefits to which an employee would not be entitled had the employee not taken leave. 29 U.S.C. § 2614(a)(3)(B); *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001); *Rice v. Sunrise Express, Inc.*, 209 F.3d 1008, 1017-18 (7th Cir. 2000); *O'Connor v. PCA Family Health Plan, Inc.*, 200 F.3d 1349, 1353-54 (11th Cir. 2000). Thus, employers may fire employees for poor performance if they would have fired them for their performance regardless of their having taken leave. *Kohls*, 259 F.3d at 805; *Hatchett v. Philander Smith Coll.*, 251 F.3d 670, 677 (8th Cir. 2001).

According to Local 881, Ogborn would have been fired even if he had not taken leave because the union discovered additional evidence of his poor work after warning him that further performance problems would lead to his termination. As President Powell explained in his deposition, if he had known of "all of the things that came up" after Ogborn's suspension, he would have fired Ogborn at that time. Ogborn maintains that Local 881's position is unsupported by any evidence that the union in fact discovered additional examples of his deficient work. But that contention is untenable given Lisa Cantanzaro's testimony that she personally fielded calls from Roger Ferrera and Janice Calise after Ogborn took leave and then handled their grievances, which Ogborn had not completed.

It is true, as Local 881's attorney effectively conceded to us in a letter submitted after the oral argument, that the union did not include the grievances themselves in its motion for summary judgment. We fail to see, however, how that omission undercuts Cantanzaro's testimony, and Ogborn has provided no evidence that the grievances identified by Cantanzaro either were properly processed or did not in fact exist. Ogborn instead complains that Local 881 hindered his ability to respond to Cantanzaro's assertions by neglecting to specifically discuss her testi-

mony in the statement of undisputed facts submitted with its motion. But Local 881 cited the relevant pages of Cantanzaro's deposition in its statement to support its assertion that the union "discovered numerous grievances that were not properly processed," and in any event the district court had discretion to overlook omissions in Local 881's statement of facts and examine Cantanzaro's testimony directly. *See Little v. Cox's Supermarkets*, 71 F.3d 637, 641 (7th Cir. 1995); *Bell, Boyd & Lloyd v. Tapy*, 896 F.2d 1101, 1103 (7th Cir. 1990); *Burke v. Gould*, 286 F.3d 513, 518 (D.C. Cir. 2002).

Ogborn also insists that significant circumstantial evidence raises an inference that Local 881 fired him for reasons unrelated to the new evidence of his poor performance. According to Ogborn, the timing of his discharge and letters written by union members praising his work, coupled with misrepresentations allegedly made by Vice President Powell at the executive board meeting and evidence that Local 881 tampered with audio recordings of the meeting, demonstrate that the union's stated reason for firing him is a "pretext." But in a suit charging violations of the substantive, as opposed to the anti-discrimination, provisions of the FMLA, proof of pretext is neither necessary nor sufficient to show a violation of the statute. *Kohls*, 259 F.3d at 806; *Diaz v. Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir. 1997); *Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1131 (9th Cir. 2001). Ogborn has elected not to pursue a claim of discrimination under the FMLA, so he needed to show that he was entitled to return to work when his medical leave ended. The circumstantial evidence identified by Ogborn fails to assist his case because it does nothing to negate the evidence that Local 881 discovered additional examples of his poor performance, which entitled the union to fire him in light of his performance history.

That leaves the award of costs. Federal Rule of Civil Procedure 54(d) provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs." According to Ogborn, the award should be reversed because Local 881's request for costs was untimely and because Local 881 was not the prevailing party. Ogborn is mistaken on both points. Northern District of Illinois Local Rule 54.1(a) provides that a bill of costs must be filed within thirty days of "the entry of a judgment allowing costs." Ogborn contends that Local 881's submission was untimely because the district court entered judgment on September 22, 2000, and Local 881 filed its bill of costs on October 25, 2000, more than thirty days later. But Ogborn confuses the date that the district court *filed* its judgment with the date that it *entered* judgment. The date in the lefthand column of the district court's docket sheet provides the filing date—here September 22—whereas the bracketed date at the end of the entry provides the entry date—here September 25, as reflected by the notation "[e]ntry date 9/25/00." *See Houston v. Greiner*, 174 F.3d 287, 288 (2d Cir. 1999). Because the entry date controls, Local 881's submission on October 25 was timely. Ogborn's remaining objection to the award of costs—that Local 881 was not the "prevailing party"—is also without merit. The district court entered judgment on Ogborn's federal claims and declined to exercise supplemental jurisdiction over his state-law claims. That resolution made Local 881 the prevailing party, even though the court dismissed Ogborn's state-law claims without prejudice. *Head v. Medford*, 62 F.3d 351, 355 (11th Cir. 1995).

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*