Clair **SYLVESTER**, Plaintiff,

v.

**DEAD RIVER COMPANY**, Defendant.

No. CIV. 02–161–B–K.

United States District Court,
D. Maine.

April 30, 2003.

Alan F. Harding, Hardings Law Offices, Luke M. Rossignol, Harding Law Offices, Presque Isle, ME, for Clair Sylvester.

James R. Erwin, Pierce, Atwood, Portland, ME, for Dead River Company.

## MEMORANDUM OF DECISION [1]

KRAVCHUK, United States Magistrate Judge.

In this removed action (Docket No. 1) Clair Sylvester charges the defendant, Dead River Company, with violating his rights under the Family and Medical Leave Act (FMLA). He claims that it was impermissible under the FMLA for Dead River to restructure his job during his medical leave from a full-time position as a gas station manager to a part-time, lower-paid position as a pump attendant. Dead River Company has moved for summary judgment. (Docket No. 6.) It argues that Sylvester's rights under the FMLA were not transgressed because he would have been in the same position with respect to the restructuring/downsizing even if he had not been on leave at the time the operative changes were made. I conclude that summary judgment is appropriate in light of the undisputed facts material to this dispute. Accordingly, I **GRANT** Dead River Company's motion.

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

### Summary Judgment Standard

I can grant summary judgment to Dead River Company only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [it] is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A fact is material if its resolution would "affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and the dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party," *id.* I review the record in the light most favorable to Sylvester, the opponent of summary judgment, and I indulge all reasonable inferences in his favor. *See Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir.2000).

### Material Facts

Sylvester was initially hired by Dead River Company (Dead River) on February 21, 2000, as a part-time service station attendant at the Mars Hill Truck Stop. There was an interruption in his employment for the period between May 4, 2000, and May 22, 2000, that according to Dead River was a consequence of economic reasons and according to Sylvester was a result of his voluntary resignation. On May 22, 2000, Sylvester was rehired by Dead River as a full-time service station manager.

As the manager Sylvester was paid $9.50 an hour for an average of forty-five hours a week. He received $14.25 an hour for overtime work. His compensation package included two weeks of paid vaca-

tion per year, ten paid holidays per year, and wage insurance.

Dead River operates a number of gas stations throughout the State of Maine. In 2000 it undertook a review of the gas stations operating in its northern region, an area managed by the company's regional manager, Alan Landeen. As a consequence of this review Dead River decided that the unprofitable gas stations in the area would be put up for sale.

The Mars Hill Truck Stop was one of the stations in Dead River's northern region under the supervision of Landeen. In 1995 the station earned approximately $12,000. This figure decreased in each of the following years. In 2001 the profit figure was $95. Because of the consistently low yearly profits at the station Dead River determined that the Mars Hill Truck Stop had to be sold; the operating margins were simply too low to justify the amount of capital investment and risk associated with operating the station. Sylvester himself signed a memo dated January 30, 2001, that stated, among several other things related to Sylvester's job performance, that Sylvester was concerned about the profitability of the Mars Hill location.

During the summer of 2001, Landeen began taking steps to sell the Mars Hill Truck Stop. He hired a broker that summer to place it on the market. In September 2001 Landeen pursued advertisement in a large regional newspaper to announce the sale and this advertisement began to run on October 4, 2001. Concerned that closing the store pending the sale would likely lead to lower sales proceeds, Dead River decided to maintain operation of the station while it was on the market. However, in order to maintain the station as a going concern, Dead River needed to reduce operating costs given that the 2001 operating margin was too low to ensure continuing viability.[2] By reducing costs and increasing profitability Landeen also hoped to attract a satisfactory buyer. During this period Landeen had no knowledge that Sylvester might seek medical leave.

The first step taken by Landeen to achieve these cost-cutting goals was to change the store from a full-service gas station to a self-service station. Although the implementation of this change occurred in the Fall of 2001, Landeen had previously raised with Sylvester the possibility of making the change on numerous occasions.[3] Landeen also discussed this

2. As part of this process, Landeen asked Sylvester to undertake a survey of the number of customers per hour at the gas station with a view to determining where staffing levels could be reduced. The parties dispute whether Sylvester knew of the purpose of the survey. Sylvester claims that he thought the survey was aimed at determining if extra help was necessary and Dead River asserts that Sylvester knew, at least indirectly, the purpose of the survey. Sylvester's perception concerning the purpose of the survey is not material to my FMLA determination.

3. The parties are not at peace with respect to nailing down the time when the decision was made by Landeen. Sylvester complains that the record is equivocal on this score, with the

range being the summer of 2001 to November 2001. (Pl.'s Opposing SMF ¶ 10.) Dead River rejoins that Sylvester has mischaracterized Landeen's deposition testimony, pointing out that Landeen testified that he made the decision "to eliminate the Store Manager position" prior to Sylvester's leave and the decision to go self-service preceded this decision. (Def.'s Reply SMF ¶ 10.) While pinning down the date of the decision might be material in a case of this ilk, in the case at hand it does not need to be identified with precision in view of Sylvester's admission that the changes were contemplated before he was on leave and were based on economic concerns.

Here, I also note that in his memorandum opposing summary judgment Sylvester quotes language from this leave memo that indicates

change with Nancy Clark, the retail fuel clerk in Dead River's heating oil delivery service located in the same building as the Mars Hill Truck Stop.

The truck stop operated from 4:30 a.m. to 8:00 p.m. on Monday through Saturday, and 7:00 a.m. to 8:00 p.m. on Sundays. While the station was operating as a full-service station Sylvester, the only full-time employee, worked from 6:30 a.m. to 4:30 p.m. five days a week. Four other attendants worked part-time to cover the remaining hours of operation. In the summer of 2001 a fifth part-time attendant either resigned (according to Dead River) or was laid-off (according to Sylvester).

Sylvester's duties as store manager included: pumping gas for customers; taking customer payments; scheduling staff attendance; ordering stock such as motor oil, windshield wiper fluid, and related items; ordering gasoline, kerosene and diesel fuel; entering payroll; conducting a monthly stock inventory; conducting safety management meetings; checking fire extinguishers; filling in for other positions when someone else was not available; and interviewing, hiring, and firing staff.

Effective October 1, 2001, Sylvester went on a sudden medical leave of absence. Sylvester had learned that he might have a lung tumor and was told by his doctor to stay away from work because of dust and other impurities in the air. In October of 2001, Sylvester contacted an employee in the Dead River Presque Isle office and told her that he would be out of work. In this conversation there was no mention of leave pursuant to the FMLA or what job Sylvester would have upon his return. Sylvester was assisted with the process of filling-out paperwork for wage insurance.

Dead River sent Sylvester a memorandum on October 15, 2001, approving Sylvester's leave request. This was the first time Sylvester recalls any mention of the FMLA. (Sylvester Dep. at 64.) This was the standard memorandum that Dead River sent to employees that had been granted FMLA leave.[4] Ultimately, Sylvester was diagnosed as having a cyst that was treatable with medications.

It was while Sylvester was out on leave that Landeen implemented the change from a full-service to a self-service station to cut costs. The change was not related to Sylvester's leave request and would have been implemented whether or not he had been out on leave. (Landeen Decl. ¶ 20.)[5] As a result of the shift to self-service, the station no longer needed someone full-time to pump gas. All that was needed was someone to collect payments when customers used the self-service pumps. Clark, the aforementioned retail

---

that he will have the same or equivalent position and pay when he returns from leave. However, Sylvester has neglected to include this representation as a material fact, relying instead on two of Dead River's statements of fact that do not expressly include the language but only use the memorandum as support for a different proposition. What is more, Sylvester has put forth no argument on how this representation would impact my analysis under the FMLA.

4. The parties disagree with respect to whether or not Sylvester relied on this memorandum in deciding to take leave. Sylvester indicates only that he did not wait for the memoran-

dum to seek medical care in Portland, Maine, but that he never discussed whether or not he would take leave regardless of what happened to his job and he did not discuss with anyone how the leave would impact his job. Dead River points out that Sylvester indicated at his deposition that he did not wait for leave determination by Dead River before seeking treatment in Portland.

5. Sylvester complains about the citation to his deposition to further support this factual assertion. It is true that his understanding of the basis for and timing of the change was not first hand, nor is material.

fuel clerk in Dead River's heating oil delivery service, was able to take payments from station customers during her normal working hours staffing the delivery service without increasing her 9:00 a.m. to 4:30 p.m. five-day-a-week schedule. Aside from Sylvester, Clark was the only other full-time employee at the Mars Hill Dead River location. While Sylvester was on leave Clark did not take leave.

At this juncture Landeen transferred other duties of the store manager position to Clark, namely: scheduling attendance; ordering stock; entering payroll; inventorying stock; and ordering fuels. Clark was able to perform these tasks without increasing her regularly scheduled hours. Dead River asserts that these changes had nothing to do with Sylvester's leave and that Landeen would have implemented them if Sylvester was not on leave (Landeen Decl. ¶ 22), while Sylvester counters that during his deposition testimony Landeen indicated that he made some of the shifts in order to fill in the gaps resulting from Sylvester's absence and, therefore, they were in this sense related to his leave. (Landeen Dep. at 69).

By running the fuel delivery office Clark had gained experience relevant to the store manager tasks. For instance, she was already responsible for cashing up the station as well as the delivery unit, a job that Sylvester never undertook vis-à-vis the station by preference. All in all, Clark needed little training for the new tasks, some of this training was done by Sylvester.[6] In contrast, in Landeen's view Sylvester could not have operated the station and the delivery operations. The duties were transferred to Clark for economic reasons.

Sylvester's doctor released him for work on November 6, 2001. After this clearance Sylvester notified Dead River that he was ready to return to work. When Sylvester reported to Landeen on November 9, 2001, Landeen notified him that the store manager position was being eliminated and that Dead River was offering him the position of gas attendant. After the station was changed to self-service the only coverage needed was from 6:30 a.m. to 9:30 a.m. five days a week and this was the shift offered to Sylvester, along with any weekend or evening shifts he wanted to take.

The hourly wage for this position ranged from $6.50 to $6.90 per hour with no fringe benefits. Sylvester stated that the reduction in pay would make it difficult for him to afford the medication he needed to treat his lung condition. In response, Landeen reiterated the offer to give Sylvester additional hours on evenings and weekends, but Sylvester refused to work those hours. Landeen then agreed to let Sylvester work from 6:30 a.m. to 11:30 a.m. even though he was not needed beyond 9:30 a.m. This created a twenty-five hour rather than a fifteen hour work week for Sylvester.

### Discussion

Sylvester makes it crystal clear that he is only challenging Dead River's action with respect to the prescriptive entitlement to FMLA leave, as opposed to lodging a claim that Dead River ran afoul of the proscriptive arm of the FMLA (*i.e.*, that it took an adverse action against Sylvester for a prohibited reason). (Pl.'s Resp. Mot. Summ. J. at 7–8.)

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period" if the employee must leave work as the result of a "serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D).

---

**6.** The parties dispute just how much training Sylvester provided Clark.

Dead River does not contest that Sylvester is an eligible employee, *see id.* § 2611(2),[7] or that he had a health problem within the meaning of § 2611(a)(1)(D).

While it is smooth sailing for Sylvester vis-à-vis these requirements, Sylvester's claim runs aground due to a different section of the FMLA: the statute expressly provides that there is only an FMLA violation if Dead River ran afoul of the restoration requirement of 29 U.S.C. § 2614(a). And, subsection (a)(3) of that provision provides that nothing in § 2614 "shall be construed to entitle any restored employee to ... any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." *Id.* § 2614(a)(3).

Sylvester contends that this "limitation" does not apply to him because he was not "a restored employee" when the reorganization of his position occurred. I find this argument unavailing. (Pl.'s Response Mot. Summ. J. at 9–10.) Other courts have not read this limitation as turning on whether or not the employee is still on leave or has been restored at the time of the change in terms of employment. *See Ogborn v. United Food & Commercial Workers Union, Local No. 881,* 305 F.3d 763, 768 (7th Cir.2002); *Kosakow v. New Rochelle Radiology Assocs.,* 274 F.3d 706, 733 (2d Cir.2001); *Kohls v. Beverly Enters. Wis., Inc.,* 259 F.3d 799, 804–07 (7th Cir. 2001); *Rice v. Sunrise Express, Inc.,* 209 F.3d 1008, 1016–19 (7th Cir.2000); *Lacey—Manarel v. Mothers Work, Inc.,* 2002 WL 506664 (S.D.N.Y.2002). Sylvester's position is also belied by 29 C.F.R. § 825.216(a)(1) that addresses situations in which a employee's position is altered or eliminated while on leave.[8]

---

7. The record does not contain information about the number of employees employed by Dead River within a seventy-five mile radius of Sylvester's worksite. *See id.* § 2611(2)(B)(ii).

8. Entitled, "Are there any limitations on an employer's obligation to reinstate an employee?" the regulation provides, as applicable:

(a) An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period. An employer must be able to show that an employee would not otherwise have been employed at the time reinstatement is requested in order to deny restoration to employment. For example: (1) If an employee is laid off during the course of taking FMLA leave and employment is terminated, the employer's responsibility to continue FMLA leave, maintain group health plan benefits and restore the employee cease at the time the employee is laid off, provided the employer has no continuing obligations under a collective bargaining agreement or otherwise. An employer would have the burden of proving that an employee would have been laid off during the FMLA leave period and, therefore, would not be entitled to restoration.

(2) If a shift has been eliminated, or overtime has been decreased, an employee would not be entitled to return to work that shift or the original overtime hours upon restoration. However, if a position on, for example, a night shift has been filled by another employee, the employee is entitled to return to the same shift on which employed before taking FMLA leave.

(b) If an employee was hired for a specific term or only to perform work on a discrete project, the employer has no obligation to restore the employee if the employment term or project is over and the employer would not otherwise have continued to employ the employee. On the other hand, if an employee was hired to perform work on a contract, and after that contract period the contract was awarded to another contractor, the successor contractor may be required to restore the employee if it is a successor employer. See § 825.107.

(c) In addition to the circumstances explained above, an employer may deny job restoration to salaried eligible employees ("key employees," as defined in paragraph (c) of § 825.217) if such denial is necessary

Sylvester has failed to controvert the facts propounded by Dead River that Sylvester would have been in the same position with respect to the reorganization had he not taken leave. Even if I place the burden associated with subsection (a)(3)(ii) squarely with Dead River, *compare Smith v. Diffee Ford–Lincoln–Mercury, Inc.*, 298 F.3d 955, 963 (10th Cir.2002) (burden on employer), *with Rice*, 209 F.3d at 1016–19 (burden on employee), Dead River prevails on this record. In this case Dead River has submitted evidence in support of its assertion that Sylvester's pre-leave position and benefits would not have been available to him by November 2001 even if he had not taken leave. It has met its "burden of proving that [Sylvester], laid off during FMLA leave, would have been dismissed regardless of [his] request for, or taking of, FMLA leave." *Smith*, 298 F.3d at 963. Indeed, all that Sylvester has offered in rebuttal of Dead River's summary judgment showing is the fact that Clark did not take leave during the time that he took leave and she remained employed full-time. He accepts that the reorganization was necessitated by the financial shakiness of the station and does not challenge Dead River's motivations for the changes.[9]

As the undisputed material facts support the conclusion that Sylvester had no entitlement to restoration, Sylvester has no FMLA claim. And because Sylvester has expressly disavowed that his is a claim that there was a retaliation or discrimination under the FMLA, this case does not require me to tread in the territory of *prima facia* showings under *Watkins v. J*

to prevent substantial and grievous economic injury to the operations of the employer ...

29 C.F.R. § 825.216.

*& S Oil Company, Inc.*, 164 F.3d 55 (1st Cir.1998).

### Conclusion

For the reasons provided above, I **GRANT** summary judgment to Dead River Company on Sylvester's one count Family and Medical Leave Act complaint.

***So Ordered.***

**9.** Sylvester whispers a suggestion that if he was there at the time of the changes things might have turned out different. However, this argument is one that is geared towards a discrimination proscriptive claim, one not pressed by Sylvester in this action.