In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-3104

MICHAEL E. DAUGHERTY,

*Plaintiff-Appellant,*

*v.*

WABASH CENTER, INC., AND JEFFREY DARLING,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 4:06-CV-00128-AS-PRC—**Allen Sharp**, *Judge*.

ARGUED JULY 7, 2009—DECIDED AUGUST 14, 2009

Before POSNER, KANNE, and SYKES, *Circuit Judges*.

PER CURIAM. Michael Daugherty sued Wabash Center, Inc., and its president, Jeffrey Darling, claiming that he was fired in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601-2654. The district court granted the defendants' motion for summary judgment, and Daugherty appeals. Because Daugherty did not show that there was a genuine issue of material fact concerning Wabash's reason for firing him, we affirm.

**Background**

Because this is an appeal from the grant of summary judgment, we construe all facts and draw all reasonable inferences from the record in favor of Daugherty, the nonmoving party. *See Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 633 (7th Cir. 2009).

Daugherty began working for Wabash, a not-for-profit agency serving adults and children with developmental disabilities, in May 1999. Between 1999 and 2006, Daugherty compiled an impressive employment record—he was promoted from a maintenance assistant to director and then vice-president of information technology. He always received "very good" or "excellent" performance reviews, and he was given a bonus for his leadership in a particular project. Daugherty was also vice-president and chief information officer of Rest Assured, LLC, a joint venture between Wabash and ResCare, Inc., that capitalized on Daugherty's idea to monitor patients via webcam.

Daugherty's work-related troubles began in the spring of 2006. He had gotten involved in "email wars" with several Wabash employees, and the Rest Assured staff complained about his management approach. On June 19, Darling and Steve McAninch, Wabash's Vice-President of Finance (and Daugherty's direct supervisor), gave Daugherty a written reprimand for sending abusive emails and for his management style. Daugherty acknowledged his professional shortcomings, and, although he thought the written reprimand was unwarranted, he agreed with the substance of the complaints and even

drafted his own corrective action plan. Darling also told Daugherty that he was revoking permission for Daugherty's planned month-long vacation, scheduled to begin that month, because of pressing company business.

Before the corrective action plan was discussed, Daugherty left the June 19 meeting to visit his doctor. He returned to Wabash to request leave under the FMLA, having a note from his doctor stating: "off work 2 weeks due to medical illness." Daugherty's application for FMLA leave does not mention a health condition, but instead describes personnel conflicts within the company, concluding: "I have been placed under a tremendous amount of stress with [Rest Assured] & [Wabash Center]. I have requested from Jeff [Darling] & Steve [McAninch] reorganization that would alleviate this stress. It was declined. My much needed vacation has been cancelled by Jeff Darling on 6-16-06." The afternoon of June 19 he requested and received two weeks off.

During his absence, Wabash uncovered troubling information about Daugherty's work performance. On June 18, Daugherty had used Wabash's credit card without authorization to order a generator that was delivered to his home. After investigating, Wabash discovered at least five unauthorized purchases, including one other that was shipped to "Daugherty's Computers" at Daugherty's home address. McAninch had previously warned Daugherty that he was required to seek authorization before making purchases. Daugherty later acknowledged his violations of company purchasing protocol, but insists that these purchases were above-board

because he never kept the items for himself, and had them shipped to his home only because Wabash couldn't easily accommodate some shipments.

Then on June 30, McAninch discovered that his computer was missing emails that he had sent to and received from Daugherty. That same day, two Wabash servers crashed. Outside experts brought in to restore the servers (because of Daugherty's absence) observed that Daugherty had failed to routinely back up the servers—one of his key responsibilities. Suspecting that Daugherty was remotely accessing (and potentially sabotaging) Wabash's network, the company asked these outside consultants to analyze Wabash's IT security and practices. The consultants' report in mid-July pointed out deficiencies in Wabash's IT infrastructure, recommending numerous changes.

Because of the purchasing irregularities, Wabash management presented a new corrective action plan to Daugherty on July 3, the day he was expected back at work. At the end of the meeting, Daugherty refused to sign the plan: he protested that signing would qualify as "work" and he was not supposed to work during medical leave. Instead he presented a new order from his doctor for continued medical leave, which Wabash granted. McAninch asked that Daugherty refrain from accessing Wabash's network while he was on leave, and asked Daugherty to turn over his keys and any passwords. Daugherty responded: "I'd rather not." Wabash requested the passwords and keys again—still unsuccessfully—on July 19 and August 3.

On July 31, a forensic expert analyzed Daugherty's computer and discovered that more than 5,000 files had been deleted on June 19—the day Daugherty was first disciplined and the day he invoked FMLA leave. On August 9, citing Daugherty's authoritarian management style, poor IT practices, failure to turn over keys, missing files, and violations of the purchasing protocols, Wabash terminated Daugherty's employment.

Daugherty filed suit in September 2006, claiming that Wabash and Darling fired him in violation of the FMLA. The district court granted the defendants' motion for summary judgment, and Daugherty appeals.

## Analysis

Daugherty challenges the district court's grant of summary judgment on two grounds: the defendants violated the Act by failing to reinstate him and retaliated against him for invoking his FMLA rights.

### A. Failure to Reinstate

Daugherty first argues that Wabash violated the FMLA by failing to reinstate him to his former position at the end of his medical leave. He contends that Wabash was absolutely prohibited from terminating him while he was on leave. According to Daugherty, even if an employer discovers a reason to fire an employee during that employee's FMLA leave, the employer must reinstate the employee before then firing him.

To show a violation of FMLA rights, plaintiffs must show that they are eligible for FMLA protection, their employer is covered by the Act, they are entitled to leave, they provided the appropriate notice, and their employer denied them benefits to which they were entitled. *Smith v. Hope Sch.*, 560 F.3d 694, 699 (7th Cir. 2009). An employee who takes leave under the FMLA is entitled to be restored to his former position, with equivalent pay and benefits. 29 U.S.C. §§ 2614, 2615(a); *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 (7th Cir. 2008), *cert. denied*, 129 S. Ct. 1361 (2009). This right is not unlimited, however: an employee is not entitled to "any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B); 29 C.F.R. § 825.216; *Harrell v. U.S. Postal Serv.*, 445 F.3d 913, 919 (7th Cir. 2006). The defendants contest only Daugherty's right to reinstatement.

Daugherty contends that, although the FMLA does not make employees on medical leave fire-proof, Wabash was required to reinstate him and then fire him if it was displeased with his performance. But because the FMLA only entitles employees to the same position they would have otherwise been entitled to, 29 U.S.C. § 2614(a)(3)(B), an employer may terminate employees—even when on leave—if the employer discovers misconduct that would justify termination had leave not been taken. "The fact that the leave permitted the employer to discover the problems can not logically be a bar to the employer's ability to fire the deficient employee." *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 806 (7th Cir. 2001).

Wabash presented undisputed evidence that Daugherty had unprofessional email exchanges with other employees, was abusive to his staff, purchased items in violation of company policy, refused to return keys and disclose passwords, and deleted company files from his workstation. At various points Daugherty admitted each of these violations of company policy, even proposing his own corrective action plan. And Daugherty makes no attempt to refute the conclusions of the outside computer consultants who reported to Wabash numerous serious deficiencies in Daugherty's performance.

Instead, Daugherty insists that being asked to turn over keys and passwords was "work," and he could not be fired for refusing to work while on medical leave. But Wabash asked for keys and passwords so the agency could operate *without* Daugherty. Moreover, these modest requests—first made on the day Wabash had expected Daugherty to return to work—are no more intrusive than the requirement to keep the employer informed about the status of medical leave, *see* 29 C.F.R. § 825.311(a), or otherwise comply with customary employer rules regarding notice, 29 C.F.R. § 825.303(c); *Lewis v. Holsum of Fort Wayne, Inc.*, 278 F.3d 706, 710 (7th Cir. 2002). There is no genuine dispute concerning Daugherty's entitlement to reinstatement: even if he had never taken leave, he would not be entitled to keep his job.

## B. Retaliation

Daugherty contends, in the alternative, that Wabash retaliated against him by firing him for exercising his

rights. *See Kauffman v. Fed. Express Corp.*, 426 F.3d 880, 884-85 (7th Cir. 2005) (distinguishing between the two theories of recovery). As with other employment discrimination statutes, a claim for retaliation under the FMLA can proceed through the direct or indirect methods of proof. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). On appeal Daugherty argues only that he made his case under the direct method.

Under the direct method of proving retaliation, a plaintiff must present evidence of a statutorily protected activity, a materially adverse action taken by the employer, and a causal connection between the two. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir.), *cert. denied*, 129 S. Ct. 738 (2008). Wabash contests only causation. "A plaintiff can prevail under the direct method by showing an admission of discrimination or by 'constructing a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 771 (7th Cir. 2008) (quoting *Phelan v. Cook County*, 463 F.3d 773, 779 (7th Cir. 2006)).

As analyzed above, Wabash presented undisputed evidence that it fired Daugherty for misconduct. Daugherty's principal argument appears to be that, although he repeatedly violated company policy, his misconduct does not justify Wabash's decision to terminate his employment. He suggests that his designation as a "key employee," *see* 29 C.F.R. § 825.217, was evidence of Wabash's discriminatory animus. But while an employer need not reinstate a key employee, 29 C.F.R.

§ 825.216, Daugherty does not contest the designation nor explain how it affected Wabash's decision to fire him. Moreover, Wabash never purported to rely on his status as a key employee to deny reinstatement.

Daugherty further argues that the timing of his termination—that is, while he was on leave—suggests that his medical leave, not his admitted professional failings, was the defendants' true motivation for firing him. Under some circumstances, an employee's termination while on leave can create an inference of discriminatory motive. *Simpson v. Office of Chief Judge of Circuit Court of Will County*, 559 F.3d 706, 713 (7th Cir. 2009). But this court has held repeatedly that temporal proximity alone is not sufficient to withstand summary judgment. *See, e.g., Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008); *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006); *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004). And, while Daugherty relies on Wabash's promise to use progressive discipline when it initially addressed his management problems, he points to no company policy or past practice violated by Wabash when it fired him after discovering additional evidence of his sub-par performance and potential sabotage. *Cf. Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 723 (7th Cir. 2005) (holding that abandonment of hiring policies supported inference of discrimination in Title VII case); *Huff v. UARCO, Inc.*, 122 F.3d 374, 382 (7th Cir. 1997) (holding that failure to follow company layoff policy supports inference of discrimination).

We do not "tell employers how to discipline employees; rather, [we] ensure that the process is not discriminatory."

*Kohls*, 259 F.3d at 805. Here, Daugherty admits that "Darling and Wabash Center are earnest in their appraisals that they fired Daugherty for performance reasons. They really, really mean it." Of course, if the defendants "really mean" that they fired him for work-related reasons, then Daugherty's termination was not retaliatory. *See Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005) ("An employer's explanation can be 'foolish or trivial or even baseless' so long as it 'honestly believed' the proffered reasons for the adverse employment action." (citations omitted)). There is no dispute concerning Wabash's motive, and therefore summary judgment was appropriate.

## Conclusion

Because Daugherty has not shown a genuine issue of material fact concerning defendants' motivation for firing him, we AFFIRM.

8-14-09