In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-1523

LAURA M. SIMPSON,

*Plaintiff-Appellant,*

*v.*

OFFICE OF THE CHIEF JUDGE OF THE CIRCUIT COURT OF
WILL COUNTY, MIKE COSTIGAN, and DOUG WILSON,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 1:05-cv-02592—**Elaine E. Bucklo**, *Judge.*

ARGUED DECEMBER 5, 2008—DECIDED MARCH 23, 2009

Before RIPPLE, KANNE, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Laura Simpson's employment as
the head of the River Valley Juvenile Detention Center
("RVDC") came to an end in November 2002, when she
was fired by her employer, the Office of the Chief Judge
of the Circuit Court of Will County, Illinois. The Chief
Judge gave a number of reasons for her termination,
principally citing a report prepared by the Will County

Auditor that alleged that Simpson engaged in acts of fraud and impropriety. Simpson, however, assumed a more nefarious purpose—she was fired while on medical leave—so she sued the Office of the Chief Judge and others for violations of the Family Medical Leave Act ("FMLA"). She claimed that, by firing her, the defendants interfered with her substantive FMLA rights, 29 U.S.C. § 2615(a)(1), and discriminated against her based on her taking FMLA leave, *id.* § 2615(a)(2). The district court sided with the Defendants, though, granting them summary judgment on all of Simpson's claims. Simpson appeals from that decision. But because Simpson fails to undermine the Chief Judge's claimed reliance on the Auditor's report (and the State's Attorney's recommendations, which echoed the Auditor's), we affirm.

## I. Background

We recount the facts in the light most favorable to Simpson, the non-moving party. *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 760 (7th Cir. 2008). Simpson worked for the Office of the Chief Judge, overseeing operations at RVDC as its Director, since 1999. She had a clean employment record, never formally disciplined or given a negative performance review. In September 2002, her title changed to "Superintendent" when Chief Judge Rodney Lechwar reorganized the office and created the Court Services Department, which encompassed the RVDC. The reorganization changed more than just her title. She previously reported directly to the Chief Judge, but under the new structure, she reported to Mike

Costigan and Doug Wilson, the Director and Assistant Director of the new Department. Still, though Costigan and Wilson were technically her superiors, only Judge Lechwar retained the authority to fire her.

On the same day that Judge Lechwar informed Simpson of the new office structure, Simpson informed Judge Lechwar of her need for time off to seek medical treatment because she was having trouble walking. For many months, Simpson experienced pain and popping in her right knee. The pain intensified in August and September of 2002, and her family doctor, Dr. Clark, referred her to an orthopedic specialist, Dr. Farrell. On September 24, Simpson told Judge Lechwar about her upcoming appointment with the specialist, and after she saw Dr. Farrell, Simpson informed Assistant Director Wilson that she might need more time off for continuing treatment.

Simpson regularly reported to work until October 16, when she visited Dr. Clark and received a note excusing her from work until October 31. From the 16th through the 31st, Simpson took paid sick leave. After an orthopedic appointment on the 31st, Dr. Farrell sent Wilson a note stating that Simpson was to be "off work until further notice." Simpson elected to have surgery on her knee, which was to take place in mid-December, and she planned to continue to take paid sick leave throughout that time.

The next day, November 1, Simpson and Wilson talked on the phone. Because Simpson did not give a definite date of return, Wilson asked her to call the office

every morning and report her status. Simpson felt this was unnecessary, yet Wilson remained steadfast. So, to avoid this reporting requirement, Simpson requested FMLA paperwork from Wilson. Wilson denied her request, though, telling her that she was not eligible for FMLA because she had not worked in her current position as Superintendent for more than a year. (That denial was wrong—though her title changed, Simpson was still employed by the Office of the Chief Judge, as she had been for well over one year, *see* 29 U.S.C. § 2611(2)(A); 29 C.F.R. § 825.110—but it proves to be inconsequential to our analysis because, as we explain, Simpson's FMLA claims are meritless.) Undeterred, Simpson then contacted the Will County Human Resources Department, but they, too, denied her request for the FMLA documents. So Simpson stayed on sick leave with no expected date of return.

At the same time Simpson was attempting to arrange her leave, the Will County Auditor's Office released a report (the "Audit Report") alleging that Simpson had engaged in fraud and other misconduct as head of RVDC. At the behest of Will County Board Member Ann Dralle, the Auditor's Office had been investigating questionable billing and payment practices at RVDC since July of 2002. Initially, the inquiry focused on a county psychologist, Dr. Amy Brown, who allegedly double-billed the county for work performed elsewhere and who spent only a fraction of her time at RVDC, despite receiving full-time pay. The Auditor's Office uncovered evidence that seemed to substantiate the allegations against Dr. Brown. But like so many public corruption scandals, the

deeper the auditors dug, the broader the scope of their investigation became. It eventually reached Simpson (referred to in the Report by her maiden name, Munch), though this stage of the investigation began after Simpson began taking sick leave for her knee problem. The auditors investigated Simpson's supervision of Dr. Brown, but they didn't stop there; they examined other aspects of Simpson's work at RVDC. In the end, the investigation revealed more about Simpson than it did about Dr. Brown, and the Audit Report, released on October 30, expressly recommended Simpson's immediate termination as Superintendent of RVDC.

The Audit Report leveled multiple allegations of misconduct against Simpson. First, it alleged that Simpson knew about many of Dr. Brown's improprieties, such as Dr. Brown's limited hours at RVDC, her receiving payment from neighboring Illinois counties for psychological evaluations undertaken while on Will County's time, and her receiving payment from Will County for court-ordered evaluations for which she was already compensated as a full-time employee. The Audit Report characterized Dr. Brown's conduct as "fraudulent practice" performed with "the full knowledge of Director Munch." The Audit Report also alleged that Simpson knew that Dr. Brown personally conducted relatively few psychological evaluations of RVDC juveniles and instead left the evaluation work to RVDC staff. This was problematic, the Report concluded, because the staff occasionally used improper evaluation techniques, which "could invalidate the results thus posing a major liability to the County."

Next, the Audit Report described Simpson's relationship with an RVDC juvenile detainee, which, the Report alleged, violated RVDC policy. RVDC's "Rules of Conduct" prohibited certain RVDC staff, including Simpson, from "fraternizing" with the detainees. The Report acknowledged that, in September 2002, Judge Badger (a Will County juvenile court judge) issued an order permitting the juvenile in question to maintain her relationship with Simpson and another RVDC employee, Anthony Malito. However, the Report found that Simpson had repeated contact with the juvenile, often taking the juvenile outside RVDC's walls, beginning in July 2002, before Judge Badger ever issued the order. Consequently, the Report concluded that Simpson's conduct with the juvenile could expose Will County to liability.

The Audit Report also found that Simpson acted negligently in handling an attempted suicide at RVDC during the previous summer. The Report stated that RVDC staff contacted Simpson about the incident, but Simpson failed to come to the facility or phone the juvenile's parents immediately. Instead, the following day, Simpson allegedly instructed an RVDC supervisor to call the juvenile's parents and "be vague and the details will come." The Report again concluded that Simpson's conduct could have adverse legal ramifications for the county.

In the end, the Audit Report recommended Simpson's immediate termination. It found that Simpson "committed fraudulent acts," "violated the RVDC code of conduct," and "put the County of Will at risk for embarrassment and lawsuits." The auditors notified the Illinois State's Attorney's office, which began its own investigation.

Shortly after its release, Judge Lechwar, Costigan, and Wilson became aware of the Audit Report's allegations against Simpson. Judge Lechwar discussed it with the Auditor and the Illinois State's Attorney's Office, both of whom recommended that Judge Lechwar fire Simpson. On November 19, Costigan called Simpson, who was still on medical leave, and asked her to attend a meeting with the Auditor and the State's Attorney about the investigation. Simpson refused, citing her leave and her need for surgery. She then sent Costigan a prescription signed by Dr. Clark explaining that she would be off work until January.

Two days later, Judge Lechwar wrote Simpson directly, requesting that she come in to discuss problems with her job performance. Simpson obliged, and she and her lawyer met with Judge Lechwar and Costigan on November 26. At this meeting, Judge Lechwar fired Simpson. The judge outlined over a dozen reasons for Simpson's discharge, including the Audit Report's findings, which, as noted, included Simpson's failure to properly supervise Dr. Brown, her personal relationship with a juvenile detainee, and her mishandling of an attempted suicide. Judge Lechwar also cited Simpson's allegedly poor relationships with county board member Ann Dralle and county judge William Penn, her previous romantic relationship with a subordinate employee, and her alleged disrespect of Costigan and Wilson. In addition, Judge Lechwar said that Simpson had not "kept people informed" about her medical leave. At the end of the meeting, Simpson asked to stay on the payroll until mid-December, but Judge Lechwar made his decision effec-

tive immediately. Simpson was still on paid medical leave at the time.

Simpson sued the Office of the Chief Judge, Costigan, and Wilson (collectively, the "Defendants") for interference with her FMLA rights, 29 U.S.C. § 2615(a)(1), and retaliation for her taking medical leave, *id.* § 2615(a)(2), arising out of her demotion from Director of RVDC to Superintendent and her termination on November 26. (Though Simpson was not on "FMLA leave" when she was fired, she was on accrued paid sick leave, which an employee may substitute for the leave guaranteed under the FMLA. *Id.* § 2612(d)(2)(B).) During discovery, depositions were taken, affidavits submitted, and documents disclosed. But Simpson claims that two crucial documents, Judge Lechwar's handwritten notes from the November 26 termination meeting and his affidavit, were provided very late in the game, accompanying the Defendants' motion for summary judgment after discovery ended. Simpson questioned the credibility of these two documents.

The district court granted summary judgment for the Defendants on all claims, finding that Simpson failed to demonstrate a genuine issue that Judge Lechwar's reasons for firing her were pretext for an improper motive. Simpson now appeals both the interference and retaliation claims but only as they relate to her termination, not her demotion.

## II. Discussion

We review the district court's grant of summary judgment de novo. *Ridings*, 537 F.3d at 760. We view the facts and all reasonable inferences drawn therefrom in the light most favorable to the non-moving party. *Id.* We affirm if we determine that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Id.*; Fed. R. Civ. P. 56(c). But the non-moving party must present more than just "bare allegations" to survive summary judgment. *de la Rama v. Ill. Dept. of Human Servs.*, 541 F.3d 681, 685 (7th Cir. 2008). The non-moving party must present " 'evidence on which the jury could reasonably find for the nonmoving party.' " *Id.* (quoting *Rozskowiak v. Vill. of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005)).

### A.  FMLA Interference

The FMLA entitles any eligible employee to twelve weeks of medical leave if the employee is unable to perform the functions of her position due to a serious health condition. 29 U.S.C. § 2612(a)(1)(D); *de la Rama*, 541 F.3d at 686. The FMLA also entitles an employee on leave to the right to return to the same position and benefits she had just before she took leave. 29 U.S.C. § 2614(a)(1)-(2); *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 909 (7th Cir. 2008). Employers must not interfere with an employee's attempt to exercise any of her FMLA rights. 29 U.S.C. § 2615(a)(1); *de la Rama*, 541 F.3d at 686. Firing an employee to prevent her from exercising her

right to return to her prior position can certainly interfere with that employee's FMLA rights. *See Haschmann v. Time Warner Entm't Co., LP*, 151 F.3d 591, 604-05 (7th Cir. 1999).

The burden to prove FMLA interference lies with the plaintiff-employee. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 908 (7th Cir. 2008); *Kohls v. Beverly Enters. Wis., Inc.*, 259 F.3d 799, 804 (7th Cir. 2001). To prevail, Simpson must show that:

> (1) she was eligible for the FMLA's protections; (2) her employer was covered by the FMLA; (3) she was entitled to leave under the FMLA; (4) she provided sufficient notice of her intent to take leave; and (5) her employer denied her FMLA benefits to which she was entitled.

*Ridings*, 537 F.3d at 761. This case concerns the fifth criterion. (Though the Defendants argued on summary judgment that Simpson failed to provide adequate notice of her leave, the district court decided for Simpson on that issue, and the Defendants do not challenge that ruling.) Simpson must prove that the Defendants denied her an FMLA benefit. Simpson was already on leave when she was fired, so the benefit at issue is her right to reinstatement.

But an employee's right to reinstatement is not absolute. *Kohls*, 259 F.3d at 804. The FMLA allows an employer to "refuse to restore an employee to their former position when restoration would confer a 'right, benefit, or position of employment' that the employee would not have been entitled to if the employee had never left the workplace."

*Id.* at 805 (quoting 29 U.S.C. § 2614(a)(3)(B)). In other words, an employee is not entitled to return to her prior position if she would have been demoted or terminated regardless of whether she took FMLA leave. *See Breneisen v. Motorola, Inc.*, 512 F.3d 972, 978 (7th Cir. 2008). For instance, "an employee may be fired for poor performance when she would have been fired for such performance even absent her leave." *Kohls*, 259 F.3d at 805. We must therefore examine why Judge Lechwar fired Simpson. *Id.* The Defendants may present evidence that Simpson was not entitled to her position, regardless of her leave. *Id.* at 804. Then, to survive summary judgment, Simpson must "overcome the employer's assertion" and raise a genuine issue of material fact that she was entitled to be reinstated. *Id.*; *see Mitchell v. Dutchmen Mfg., Inc.*, 389 F.3d 746, 748 (7th Cir. 2004).

That Simpson was fired while on medical leave does not alter our inquiry. We recognize that an employee's termination while she was on leave could, in some circumstances, create an inference of employer impropriety: "if, for example, a supervisor who had been aware of problems with an employee did not decide to fire the employee until she took leave, and the supervisor based the firing on the incidents of which the employer had already been aware." *Kohls*, 259 F.3d at 805-06. But the timing of termination is not, by itself, a ticket to trial: "[W]here an employee is terminated while taking FMLA leave, the trial court must determine whether the termination was illegally motivated by the employee's choice to take leave, or whether the termination was motivated by other, valid reasons." *Phelan v. City of Chicago*, 347 F.3d 679,

683 (7th Cir. 2003). Simpson bears the burden of proving that Judge Lechwar's reasons were "illegally motivated" and thus that she was entitled to reinstatement. *See Mitchell*, 389 F.3d at 748.

Other than timing, Simpson offers hardly any evidence linking her termination to her leave-taking. She cites a snippet from Judge Lechwar's deposition, in which he described what some staff members said after repeatedly being unable to contact Simpson about the Auditor's and State's Attorney's investigations: "As a result, words were bandied about by various people, well, is she hiding or is she sick or what is going on. Those kinds of questions were raised." We find this testimony of little help to Simpson. Though Simpson would have us focus on the word "sick," the context of the testimony shows that Judge Lechwar's comment had nothing to do with her medical leave. Instead, it concerned the ongoing investigation into Simpson's alleged misconduct and reflected how the staff expressed its frustration about Simpson's unwillingness to cooperate with that investigation. This testimony is not evidence of FMLA interference.

Simpson also tries to connect the Will County Auditor's investigation to her medical leave, in essence arguing that the Audit Report was the product of a witch hunt. She points to the timing of the investigation, which she claims began just after she took leave, and contends that it raises a triable inference that the investigation was prompted by her taking leave. The record, however, shows a different sequence of events. Simpson is correct that

Catherine Pleasant, the deputy auditor, testified that she began investigating Simpson's conduct in the fall of 2002, after Simpson had taken leave. But this investigation grew out of the Auditor's inquiry into Dr. Brown's questionable billing practices at RVDC, and county board member Ann Dralle requested that inquiry in July 2002, months before Simpson ever mentioned taking medical leave.

Even if we accept Simpson's version of the Audit Report's timing, though, she fails to cite sufficient evidence to link the Audit Report to her leave-taking. Temporal proximity between an adverse employment action and a plaintiff's exercise of her statutory rights "will rarely be sufficient in and of itself to create a triable issue." *Stone v. City of Indianapolis Pub. Utils. Div.*, 281 F.3d 640, 644 (7th Cir. 2002). Simpson presents no evidence that Judge Lechwar, Costigan, or Wilson instigated, encouraged, or had anything to do with the Auditor's investigation of Simpson. Pleasant testified that county board member Dralle initially requested the RVDC review, and the record is devoid of any suggestion that the Defendants influenced that request. Likewise, the record reveals no evidence evincing animus toward Simpson on the part of the Auditor's Office, an independent county agency, nor does it show that the Defendants influenced the Auditor's investigation. Accordingly, we find no evidence to support an inference that any of the Defendants, board member Dralle, or the Auditor's Office, individually or collectively, hatched a plan to terminate Simpson for taking leave by using the Auditor's investigation as cover.

In fact, the timing of the release of the Audit Report undermines Simpson's position. We have said that an employee might be able to sustain her FMLA interference claim against an employer who waited until the employee took leave to fire her for problems of which the employer was already aware. *Kohls*, 259 F.3d at 806. In this case, however, Judge Lechwar became aware of the Audit Report's allegations and recommendation weeks after Simpson took leave. The Report provided new information upon which Judge Lechwar based his termination decision, supporting the Defendant's contention that Judge Lechwar terminated Simpson for reasons unrelated to her leave.

The only strand of evidence that arguably ties Simpson's termination to her leave-taking is her deposition testimony that, at the termination meeting, Judge Lechwar stated that Simpson had not "kept people informed" about her sick leave. But that link is a loose one. Firing an employee for failing to communicate about her leave is different from firing an employee for taking that leave; Simpson must prove the latter. Still, if viewed in an evidentiary vacuum, this testimony might suggest that Simpson would still be employed had she not taken medical leave.

But we do not evaluate FMLA interference claims by looking at snippets of deposition testimony in isolation. When an employer presents evidence that its employee was not entitled to her position regardless of her taking leave, the employee must "overcome the employer's assertion" to establish a viable FMLA interference claim.

*Id.* at 804. In other words, Simpson's burden on summary judgment is to raise a genuine issue of fact that she was entitled to be reinstated, *id.*; *Mitchell*, 389 F.3d at 748, or, put differently, that her termination was "illegally motivated by [her] choice to take leave" and not "motivated by other, valid reasons," *Phelan*, 347 F.3d at 683. Simpson fails to sufficiently dispute the most compelling reason for her termination: that Judge Lechwar relied on the Audit Report's findings.

At the time of her firing, Simpson was under investigation by the State's Attorney and the Will County Auditor for her alleged involvement in a fraudulent billing scheme. The Audit Report explicitly recommended her immediate dismissal because she "committed fraudulent acts" and "violated the RVDC code of conduct on more than one instance." The Report detailed allegations of misconduct that included Simpson's knowledge of Dr. Brown's unsavory billing practices, Simpson's contact with a juvenile detainee, and Simpson's mishandling of an attempted suicide at her facility. Simpson does not dispute that Judge Lechwar met with officials from the State's Attorney's office and the Auditor's office prior to the November 26 termination meeting. And she does not dispute that the State's Attorney urged Judge Lechwar to terminate her. Thus, it is clear that Judge Lechwar was aware of the allegations of impropriety circling Simpson. In fact, Judge Lechwar had Costigan call Simpson to see if she would come in and talk with the prosecutors and auditors. Such allegations and recommendations by independent state and local agencies are certainly "valid reasons" to terminate an

employee. *See Kohls*, 259 F.3d at 805 ("An employer un-
doubtedly has the discretion to fire an at-will employee
for mishandling and mismanaging funds or for poor
performance, or both.").

According to Simpson, however, these reasons are far
from valid; they're lies. She contends that Judge Lechwar's
justification for her termination, including his reliance
on the Audit Report, was merely pretext for his true
purpose—to fire her because she took FMLA leave. Al-
though proof of pretext is not necessarily sufficient, by
itself, to support an FMLA interference claim, it can
have some evidentiary value. *Id.* at 806 (citing *Diaz v.
Fort Wayne Foundry Corp.*, 131 F.3d 711, 713 (7th Cir.
1997)). But Simpson's pretext arguments fail because
the record does not even hint that Judge Lechwar lied
when he said he relied on the Audit Report and fired
her for mismanaging Dr. Brown, violating the RVDC
Rules of Conduct and mishandling an attempted suicide.

Simpson does not dispute Judge Lechwar's awareness
of the Auditor's findings or the State's Attorney's recom-
mendations. Instead, she attacks the Audit Report and
those who prepared it, arguing that the Report was inac-
curate and that the preparers' "knowledge of the River
Valley Detention Center . . . was grossly wanting." She
argues that Judge Lechwar knew the Report mischarac-
terized her conduct and that he could not have honestly
relied on it to fire her. Even taking the facts in the light
most favorable to Simpson, though, the evidence does not
show that Judge Lechwar believed the Report to be a
fraud. Not only does Simpson fail to provide any evi-

dence that Judge Lechwar believed the Report to be false, but she fails to show that Judge Lechwar even had enough information to plausibly question its accuracy.

For example, the Report alleged that Simpson knew that Dr. Brown, while employed full-time at RVDC, (1) worked only a few hours per week, (2) had RVDC staff administer psychological evaluations, (3) improperly billed other counties for out-of-county work, and (4) improperly billed Will County for court-ordered psychological evaluations despite her full-time status. It is without dispute that Judge Lechwar lacked the knowledge to question the accuracy of the first three allegations. Judge Lechwar was not Dr. Brown's supervisor; Simpson was. Simpson does not suggest that Judge Lechwar was aware of Dr. Brown's work schedule, how Dr. Brown conducted evaluations, or if Dr. Brown performed out-of-county work.

Judge Lechwar might have been able to question the fourth allegation, since his office approved payments to Dr. Brown. Yet Simpson cites no evidence to suggest that Judge Lechwar knew that Dr. Brown was separately billing the county for psych evaluations on top of her full-time pay, or that Judge Lechwar believed that Dr. Brown was permitted to receive such payments. In fact, Simpson cites no evidence that Dr. Brown was entitled to separately bill the county at all. Simply because Judge Lechwar's office paid Dr. Brown's bills does not raise an inference that Judge Lechwar doubted the Audit Report's accuracy. Without some evidence that Judge Lechwar believed the Audit Report's findings with

respect to Simpson and Dr. Brown were false, Simpson fails to show that Judge Lechwar's reliance on those findings was pretextual.

Similarly, Simpson challenges Judge Lechwar's reliance on the Report's allegation that she violated the RVDC "Rules of Conduct." The Report alleged that Simpson violated the Rules by "fraternizing" with a female detainee, purchasing meals and clothing for her, and taking her on excursions outside the RVDC. Simpson does not deny her relationship with the juvenile. Instead, she argues that her conduct did not violate the "no-fraternization policy" and Judge Lechwar knew it, implying that Judge Lechwar could not have honestly relied on an allegation he knew was false. Simpson cites a court order from Judge Badger, the county juvenile court judge, which purported to authorize Simpson to maintain a relationship with the juvenile. But this order was issued on September 30, 2002—the Report alleged that Simpson went on excursions with the juvenile outside the RVDC at least ten times before that date. So the order is not evidence that Judge Lechwar believed the Report was wrong.

Undeterred, Simpson cites a transcript of an October 2001 proceeding, in which Judge Badger discussed allowing contact between Simpson and this same detainee. This transcript, she argues, authorized Simpson's contact with the juvenile before Judge Badger issued the September 2002 order and therefore covered those ten excursions listed in the Report. But this argument is missing a key step—Simpson fails to point to any

evidence that Judge Lechwar read or knew about the October 2001 transcript before he fired her. Simpson claims that Wilson knew about it, but she fails to show that Wilson told Judge Lechwar about it (Wilson was not at the termination meeting, after all) or that Judge Lechwar learned about it on his own. Instead, she contends that Judge Lechwar and Costigan "recklessly failed to examine" the transcript. But a failure to examine is not proof of pretext. It does not show that Judge Lechwar doubted the Report's veracity; at best it shows negligence, and negligence is not pretext.

Even if Judge Lechwar knew about the transcript, it wouldn't help Simpson's case. Simpson cannot show why the transcript would lead Judge Lechwar to believe the Audit Report was inaccurate. Simpson claims that the transcript (and the court order, for that matter) absolved her of her duty to abide by the Rules of Conduct. But neither the transcript nor the order purports to supersede the Rules of Conduct. And Simpson does not point us to any provision in the Rules or in any other RVDC or Will County policy that would authorize Simpson to fraternize with a detainee under any circumstances. So even with the transcript, Judge Lechwar would have no reason to doubt the Audit Report's finding that Simpson violated the Rules. Accordingly, neither the transcript nor the order support Simpson's claim that Judge Lechwar believed the Audit Report's allegations were false but relied on them anyway as cover for an unlawful motive.

Simpson also aims to prove pretext by attacking Judge Lechwar's credibility more generally. For instance, she

suggests that Judge Lechwar fabricated his handwritten meeting notes and his affidavit, because the Defendants purportedly produced them "at the eleventh hour," after discovery ended. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 407 (7th Cir. 2008) ("[L]ate justification . . . provided at the eleventh hour in conjunction with Defendant's motion for summary judgment, raises a genuine issue of material fact as to whether this justification is a later fabrication on Defendant's part."). In her deposition, however, Simpson acknowledged that Judge Lechwar made notes during the termination meeting and that she saw those notes at his deposition. Now on appeal, though, Simpson believes she was mistaken at her deposition, and contends that the notes she saw during Judge Lechwar's deposition were actually Costigan's, not Judge Lechwar's. Even assuming that Simpson is correct on this point, the Defendants' late disclosure of the notes does not raise a triable issue as to fabrication. Costigan's meeting notes, which Simpson does not allege were disclosed late or fabricated, are substantially similar to Judge Lechwar's, listing many of the same reasons for termination contained in Judge Lechwar's notes. Hence, even if Judge Lechwar's notes were disclosed late, the "justification" for Simpson's termination was not, as it was also contained in Costigan's notes, which were timely disclosed.

  Finally, Simpson assails Judge Lechwar's credibility by citing contradictions between his affidavit and the other Defendants' depositions. But none of their testimony established that Judge Lechwar fired Simpson for an illegal purpose, and none contradicted the claim that the

Audit Report's findings motivated Simpson's termination. In other words, neither this testimony nor any other allegedly contradictory evidence (e.g., Judge Penn testified that he had a good relationship with Simpson) helps Simpson "overcome the employer's assertion" that she was fired for reasons wholly unrelated to her medical leave. *Cf. Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) ("The fact that some of these reasons were successfully called into question by Russell's deposition or affidavit does not defeat summary judgment if at least one reason for each of the actions stands unquestioned.").

Because Judge Lechwar's reliance on the Audit Report's findings and recommendations stands unquestioned and because Simpson fails to provide any evidence that she would still be employed had she not taken leave, we conclude that Simpson has not raised a genuine issue that she was entitled to reinstatement. She cannot prove interference with her FMLA rights; the district court properly granted summary judgment for the Defendants on this claim.

## B.  FMLA Discrimination

Simpson also alleges that the Defendants discriminated against her for taking leave. In addition to prohibiting interference with an employee's FMLA rights, the FMLA proscribes "discriminat[ion] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). There are two paths through which a plaintiff might establish a discrimina-

tion claim—the "direct" and "indirect" methods. *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004). Simpson argues that she prevails under either method.

### 1. The Direct Method

To survive summary judgment under the direct method, Simpson must present evidence of "(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 593 (7th Cir. 2008). Either direct or circumstantial evidence will do. *Id.* "Circumstantial" evidence is evidence that allows the factfinder to "infer intentional discrimination by the decisionmaker," while "direct" evidence "prove[s] the fact in question without reliance upon inference." *Id.* (emphasis omitted). Direct evidence usually involves some form of admission by the decisionmaker. *Id.*

In Simpson's case, neither type of evidence is present to prove a causal connection between her leave and her termination. Simpson claims that the totality of the circumstantial evidence—the timing of the audit and fact that she has never been disciplined or received a negative review—evinces retaliatory intent. As we discussed in the previous section, it does not. The audit began in July; Simpson took leave in October. Moreover, Simpson offers no evidence that Pleasant or Dralle harbored any discriminatory animus toward her, nor does she cite any evidence suggesting that Judge Lechwar influenced the audit to target Simpson for taking leave. That an employee has never been disciplined or negatively reviewed in the

past does not, by itself, raise an inference that she was fired for improper reasons. An employer's perception of an employee's performance can change, and might sometimes change dramatically. Case in point, both an independent auditor and the State's Attorney's office recommended Simpson's firing due to serious allegations of fraud and impropriety. Unable to refute Judge Lechwar's reliance on these allegations, and without some evidence linking her leave to her termination, Simpson cannot sustain her FMLA discrimination claim under the direct method.

### 2. The Indirect Method

Under the indirect, burden-shifting method, the employee must establish a prima facie case by showing that she

> (1) engaged in a statutorily protected activity;
> (2) met her employer's legitimate expectations;
> (3) suffered an adverse employment action; and
> (4) was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.

*Id.* at 593; *see also Buie*, 366 F.3d at 503. If she satisfies the four prima facie elements, the burden shifts to the employer to show a non-discriminatory reason for firing the employee. *Caskey*, 535 F.3d at 593. If the employer makes such a showing, the burden then shifts back to the employee to establish that the purported reason is pretextual. *Id.*

Simpson's claim under the indirect method falls short on a number of levels. First, in her opening appellate brief, Simpson argues that she is excused from showing that she was treated less favorably than similarly situated employees because her position was "unique." Her theory is itself somewhat unique and lacks circuit authority. She asserts, in essence, that an employee holding a position that has no comparison in an organization is excused from pointing to a similarly situated employee to fulfill her indirect method burden of production. In support, she cites a series of "mini-reduction-in-force" (or "mini-RIF") cases, in which we dispensed with the "similarly situated employee" element where an employer terminated an employee and then, instead of refilling her position, allowed other workers to absorb the fired employee's duties. *Bellaver v. Quanex Corp.*, 200 F.3d 485, 495 (7th Cir. 2000); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 693 (7th Cir. 2000). But those circumstances do not describe Simpson's case. She was not let go in a RIF, mini or otherwise. A replacement was hired for her position not long after she was terminated. Other RVDC employees did not absorb her duties. And Judge Lechwar did not characterize Simpson's firing as a reduction in force; he fired her for misconduct and poor performance (which makes us wonder why Defendants did not argue that Simpson failed to meet the second prima facie element, that Simpson "met her employer's legitimate expectations").

Moreover, whether we should extend the mini-RIF exception to non-mini-RIF cases where an employee claims to occupy a truly "unique" position is a question

we need not decide. Simpson's argument is made almost in passing, without serious development. She never explains why extending the mini-RIF exception is logical or desirable, and in fact, she never recognizes that her argument requires any extension of existing law at all. Even if she did, she failed to identify facts at the district court or on appeal to demonstrate that her position was unique. In her abbreviated mention of her "uniqueness" theory in this court, without record citation, Simpson merely concludes that her position was singular and that she was only person who occupied it and performed her specific duties. She doesn't even attempt to look beyond the RVDC to assess whether anyone employed by the Will County Circuit Court system would fit a broad understanding of "similarly situated." Under Simpson's undeveloped argument, nearly every plaintiff claiming discrimination, particularly those in supervisory roles, could claim that their position has unique duties. This is clearly incorrect, particularly in light of our precedent that courts are not bound by rigid parameters when considering whether others are similarly situated. *See Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007) ("[C]ourts should apply a 'common-sense' factual inquiry—essentially, are there enough common features between the individuals to allow a meaningful comparison? . . . It is not an unyielding, inflexible requirement that requires near one-to-one mapping between employees—distinctions can always be found in particular job duties or performance histories or the nature of the alleged transgressions."), *aff'd*, 128 S. Ct. 1951 (2008). Accordingly, Simpson's attempt to

duck the fourth leg of the indirect method was also doomed for lack of showing her job's uniqueness.

Perhaps Simpson already knew that, though, because in her reply brief, she makes no mention of *Bellaver*, *Michas*, or her "unique employee" exception. Instead, she argues that she was treated differently from Anthony Malito, the Assistant Superintendent of RVDC, whom she contends was a similarly situated employee. But Simpson's about-face is too late. "Arguments raised for the first time in a reply brief are waived." *James v. Sheahan*, 137 F.3d 1003, 1008 (7th Cir. 1998). Not only that, but Simpson failed to raise her comparator argument in the district court, opting instead to rely on the mini-RIF cases. This, too, results in waiver. *Bus. Sys. Eng'g, Inc. v. Int'l Bus. Machs. Corp.*, 547 F.3d 882, 889 n.3 (7th Cir. 2008) ("Arguments not raised before the district court are waived on appeal.").

Beyond being too late, Simpson's Malito comparison is also too little. Though he had a similar title, job description, and even some similar circumstances, Anthony Malito was not sufficiently similarly situated to Simpson.

> [A] plaintiff need not present a doppelganger who differs only by having remained in the employer's good graces. But the comparator must still be similar enough "to eliminate confounding variables, such as differing roles, performance histories, or decision-making personnel, [so as to] isolate the critical independent variable: complaints about discrimination."

*Filar v. Bd. of Educ. of City of Chi.*, 526 F.3d 1054, 1061 (7th Cir. 2008) (second insertion in original) (quoting *Humphries*, 474 F.3d at 405). As Assistant Superintendent, Malito was directly under Simpson and he had many of the same responsibilities as Simpson. He even seemed to have "fraternized" with the same juvenile detainee that Simpson did. And we have tended to look more broadly for appropriate comparators when an employee holds an arguably unique job description. *See McNabola v. Chi. Transit Auth.*, 10 F.3d 501, 514 (7th Cir. 1993) (holding that a *per diem* physician could be adequately compared to *per diem* attorneys in an organization with a limited number of *per diem* physicians).

But the Audit Report makes Malito far from comparable; the Report didn't even mention him. The Report and its allegations surrounding Simpson's supervision of Dr. Brown, contact with the juvenile, and mishandling of an attempted suicide would no doubt confound a factfinder's ability to accurately compare Malito's employment to Simpson's. Moreover, Simpson does not suggest that Malito was, like her, under investigation by the Illinois State's Attorney. These differences in employment circumstances trump any similarity that might allow a jury to "isolate the critical independent variable" and infer that Simpson's termination was retaliatory. *See Argyropoulos v. City of Alton*, 539 F.3d 724, 735 (7th Cir. 2008) ("Only if the other employee had engaged in similar misconduct while employed by the City would this employee possibly serve as a useful comparator." (emphasis omitted)).

Still, even if Simpson could identify an appropriate comparator, whether it was Malito or someone else (or if that identification were to be excused because of the incomparable uniqueness of her position), Simpson's claim cannot survive summary judgment. Assuming that Simpson could clear the low prima facie hurdle, the defense's presentation of a legitimate reason for her termination requires that she show proof of pretext. But, as we discussed earlier, she cannot. Simpson fails to point to any evidence of record from which a jury could infer that Judge Lechwar's reliance on the Audit Report's findings was pretextual. Accordingly, we conclude that the district court's grant of summary judgment on the FMLA retaliation claim was correct.

### III.  Conclusion

Because we conclude that Laura Simpson failed to show a genuine issue of fact that she was entitled to reinstatement as Superintendent of RVDC following her leave, we AFFIRM the district court's grant of summary judgment on her FMLA interference claim. We also conclude that Simpson failed to present evidence sufficient for a jury to infer FMLA discrimination and thus AFFIRM the district court's grant of summary judgment on that claim.